COMMONWEALTH LAND TITLE
INS. CO., Plaintiff,

v.

OZARK GLOBAL, L.C., Defendant.

Civil Action No. 96–0732–RV–M.

United States District Court,
S.D. Alabama,
Southern Division.

March 13, 1997.

As Amended March 19, 1997 nunc pro tunc.

Wade B. Perry, Jr., Mobile, AL, for plaintiff.

Allan R. Chason, Bay Minette, AL, for defendant.

## ORDER

VOLLMER, District Judge.

Presently before the court are the cross-motions for summary judgment (defendant's at Doc. 9 and plaintiff's at Doc. 12), each with a supporting brief (Docs. 10 and 13, respectively). Plaintiff has filed a brief (Doc. 16) in opposition to defendant's motion for summary judgment. Likewise, defendant has filed a brief (Doc. 15) in opposition to plaintiff's motion for summary judgment. The parties have also filed a joint stipulation of facts (Doc. 7) which, they agree, will control the court's ruling on the cross-motions for summary judgment. The parties contend, and the court so finds, that only questions of law remain for determination in this action.

The court has carefully reviewed the law and considered the arguments of the parties. For the reasons set forth below, it is the decision of the court that plaintiff's motion for summary judgment is due to be granted.

## I. BACKGROUND

### A. *Jurisdiction*

Plaintiff is a citizen of Pennsylvania. Defendant is a citizen of Missouri. Since there is complete diversity of citizenship between the parties and the amount in controversy exceeds $50,000.00,[1] the court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

### B. *Venue*

Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(a).

### C. *Standard of Review*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress, Inc.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). All evidence must be viewed in the light most favorable to the non-moving party. *Alphin v. Sears, Roebuck & Co*, 940 F.2d 1497, 1500 (11th Cir. 1991); *Langston v. ACT*, 890 F.2d 380, 383 (11th Cir.1989). In ruling on a motion for summary judgment, the function of the Court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is an issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 242–43, 106 S.Ct. 2505, 2507, 91 L.Ed.2d 202 (1986). The standard for summary judgment is the same as that for a directed verdict: "the trial judge must grant [the motion] if, under governing law, there can be but one reasonable conclusion as to the verdict." *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir.1996).

## II. FINDINGS OF FACT

The facts pertinent to the resolution of the cross-motions for summary judgment are undisputed and set forth in the parties' Stipulated Facts for Submission with Summary Judgment Motion (Doc. 7). The facts, as set forth in said document and now adopted by the court, are as follows:

"Commonwealth Land Title Insurance Company ("Commonwealth") is a title insurance company with its principal place of business in the State of Pennsylvania, but doing business in Mobile County, Alabama, and elsewhere. Ozark Global, L.C. ("Global") is an entity with its principal place of business in the States of Missouri, but doing business in Mobile County, Alabama, and elsewhere, which has had certain business dealings with Commonwealth as more fully appears hereinafter.

"On January 9, 1996, Fletcher Oil Company executed and delivered a warranty deed to Global conveying certain real estate in Mobile County, Alabama, as more fully appears in the copy of such deed annexed hereto as Exhibit "A" [*see* Doc. 7].

"The Fletcher Oil Company deed (Exhibit "A") was expressly made subject to six State of Alabama revenue tax liens against Fletcher Oil Company as more fully identified in Exhibit "A" securing an indebtedness in excess of Fifty Thousand Dollars ($50,000.00).

"On January 10, 1996, Global applied for a policy of title insurance insuring its title to the property acquired from Fletcher, which policy was issued on January 29, 1996, and a copy of which is annexed hereto as Exhibit "B" [*see* Doc. 7].

"The policy of title insurance (Exhibit "B") failed to list as exceptions those same State of Alabama Department of Revenue tax liens set out in the deed from Fletcher to Ozark Global, L.C., although such liens had not been released.

"The failure to list as exception to Exhibit "B" was a mistake made through inadvertence or oversight on the part of Commonwealth. Global made no mistake, nor did Global participate in or contribute in any way to such mistake or oversight. Global knew or should have known at all applicable times that such liens had not been released of record. Global has not relied to its detri-

---

**1.** This action was filed in 1996, before the requisite amount in controversy was raised to sums exceeding $75,000.00.

ment on the mistaken failure to list such liens in the January 29, 1996, Title Policy.

"On or about April 9, 1996, Global obtained from Commonwealth a commitment for a policy of title insurance to insure a reconveyance by Global of the same property originally acquired from Fletcher, a copy of such commitment being attached hereto as Exhibit "C" [*see* Doc. 7]. Commonwealth's commitment for title insurance issued with respect to a proposed sale from Global to B.D.P., L.C. with respect to the same property in fact did list as exceptions these same Alabama Department of Revenue tax liens.

"A dispute arose as between Commonwealth and Global with respect to responsibility for the aforesaid State of Alabama tax liens. In order that the proposed sale by Global might go forward, the parties agreed to permit the transaction to close, and to escrow so much of the proceeds as would be necessary to pay the aforesaid State of Alabama tax liens, pending a determination of whether Commonwealth is obligate to pay those liens under the circumstances set out above. A copy of the escrow agreement is attached as Exhibit "D" [*see* Doc. 7]. The allocation or responsibility for said unpaid tax liens to be determined in this action may be done without prejudice to any rights acquired by third parties in good faith and for value.

Commonwealth's Complaint contains two counts. Count one is a request for declaratory relief. Commonwealth seeks a declaration that the six Alabama Department of Revenue tax liens are excluded from coverage under the title insurance policy it issued to Global. Alternatively, in count two, Commonwealth seeks reformation of the title insurance policy, pursuant to Ala.Code § 8–1–2 (1975), because of alleged mutual or unilateral mistake made in failing to list the six tax liens as coverage exceptions on the policy form.

## III. CONCLUSIONS OF LAW

Before proceeding to the specifics of this case, it is important to recognize the general nature and purpose of title insurance. Usu-

ally, a prospective purchaser of title insurance avails itself of the services of a title insurance company *before* it enters into an agreement to purchase the land for which he seeks to have title insured. In the typical situation, the prospective purchaser is a stranger to the land; it has no significant knowledge of the land and has not performed a search of probate court records. Thus, the prospective purchaser lacks any knowledge of encumbrances which may cloud the title to that particular piece of real estate. Therefore, the prospective purchaser employs the services of a title insurance company so that it can learn whether encumbrances exist and obtain insurance against those title defects which may arise after issuance of the policy. In this regard, the title insurance company will perform a title search.[2] If the search reveals any encumbrances upon the land, the prospective purchaser is so informed. When and if the prospective purchaser decides to buy the land, it takes title with the knowledge of whether it takes the property free and clear or as encumbered real estate. The prospective purchaser will also obtain a title insurance policy from the insurance company. In all but the most rare of circumstance, the insurer issues the insured purchaser a title policy which excludes coverage for all encumbrances revealed by the title search.

The needs and expectations of the typical prospective purchaser who engages the services of a title insurance company has been described as follows:

The purpose of title insurance is to protect a purchaser of real estate against title **surprises.** *Pohrer v. Title Insurance Co. of Minnesota,* 652 F.Supp. 348, 352 (N.D.Ill.1987). **A prospective purchaser** of real estate relies on the title insurer's search when they decide whether or not to purchase the property. Thus, they expect the insurer to have (1) researched the applicable law, as well as the records, before issuing the commitment and (2) to provide warnings about areas in which they might find surprises. *Pohrer,* 652 F.Supp. 348 at 353. Moreover, when a person finalizes a

---

**2.** In this case, it is not clear whether Commonwealth performed a title search before it issued the policy to Global.

real estate transaction and purchases title insurance, they expect to obtain a professional title search, legal opinion on the condition of title and a guarantee. *McLaughlin v. Attorneys' Title Guaranty Fund, Inc.*, 61 Ill.App.3d 911, 18 Ill.Dec. 891, 895, 378 N.E.2d 355, 359 (1978). *Radovanov v. Land Title Co. of America, Inc.*, 189 Ill.App.3d 433, 136 Ill.Dec. 827, 830, 545 N.E.2d 351, 354 (1989), *app. denied*, 129 Ill.2d 572, 140 Ill.Dec. 680, 550 N.E.2d 565 (1990) (emphasis added).

■ It is undisputed that the warranty deed which Fletcher Oil provided Global listed the six tax liens as exceptions from the warranty. The warranty deed thus gave Global actual notice that there were encumbrances upon the land, i.e., Global knew that it was not taking title to the land in fee simple. It is also undisputed that Global did not apply for or receive a policy of title insurance from Commonwealth until *after* it received the warranty deed from Fletcher. Drawing on these facts, Commonwealth correctly concludes that "since the title policy was applied for after the deed was signed, Global did not rely on Commonwealth to advise it of encumbrances on the property." Brief in Supp. of Pl.'s Mot. for Summ.J. at 5.

■ Global's non-reliance upon Commonwealth for advisement as to whether the purchased land was encumbered is of utmost importance, for this fact displaces the general rule that a title insurer is liable for all title defects not specifically listed as exceptions to coverage. Under the general rule, as stated by the Alabama Supreme Court,

> [a] title insurance company has an obligation to answer for any loss due to a defect in title if it has not excepted that defect from its coverage. It cannot escape liability when it does not except a defect that is a matter of public record. It is generally assumed that a title defect that appears in the public records but that is not noted is covered by a title policy.

*Parker v. Ward*, 614 So.2d 975, 977 (Ala. 1992) (as modified). The Court went on to cite with approval its holding in another case that "a title insurance company ha[s] a duty to search the public records and to reveal [to the insured] any defect that such a search might disclose." *Id.* The purpose of assigning the title insurer a duty to search and imposing liability on the insurer for unexcepted title defects that appear in public records is, using the words of the Illinois Court of Appeals, "to protect a purchaser of real estate against title *surprises*." When, as in this case, the insured has knowingly purchased land encumbered by tax liens, it cannot be said that the insured will experience "surprise" when the title insurance policy does not list the known encumbrance as an exception to coverage.

In *Parker*, the purchaser bought the land and the title insurance policy at the same time; and, before the title policy was issued, the insurer—Commonwealth—performed a title search. *Id.* at 976, 978. The policy failed to list as an exception, however, a certain timber deed that was recorded in the probate records. *Id.* at 976. In that case, the Supreme Court of Alabama reversed the trial court's grant of summary judgment in favor of the title insurer and held that the insurer "had a contractual obligation to search the records in the office of the judge of probate and to disclose any defects in those records to Parker, or else to compensate him for any loss suffered as a result of that defect." *Id.* at 978. This holding hinged largely on the fact that the purchaser, as far as the record on appeal demonstrated, had relied on Commonwealth's advice as to whether the land was encumbered. In fact, the Court stated that "Commonwealth may have a defense to Parker's action for breach of contract if it can prove to the satisfaction of a factfinder that he knew, as it asserts in its brief, that the timber on the land he bought had been previously deeded away, but that issue was not resolved on the motion for summary judgment." *Id.*

The knowledge defense noted in *Parker* squarely presents itself in the facts of this case. Because Global knew that the land in question was encumbered before it applied for or received the title insurance policy, *see supra* pp. 990–91, the court holds that Commonwealth has not breached its contractual duties to Global and, therefore, is not responsible for payment of the six Alabama tax liens.

Alternatively, the court holds that the six tax liens fell within the "created, suffered, assumed or agreed to by the insured claimant" exclusion in the title policy such that Commonwealth is not responsible for the payment of those liens. A tax lien is a claim, encumbrance, or charge on real estate, in favor of a government entity, which may be foreclosed for nonpayment of taxes. *See* Black's Law Dictionary (Centennial Ed.) at 922, 1462. When Global took the warranty deed from Fletcher in exchange for valuable consideration, Global took the land "subject to" the six tax liens. Complaint Ex. A at 1 (Doc. 1). Thus, if Fletcher failed to pay the tax assessments which gave rise to the liens and Global remained the owner of the land during the entire collection period, Global would have to either pay the assessments or expose the land to foreclosure by the State of Alabama. Common sense dictates that Global "assumed or agreed to" such defects in title by taking the land subject to the tax liens. This was the holding in *Lawyers Title Insurance Corporation v. Research Loan & Investment Corporation*, 361 F.2d 764 (8th Cir.1966), which the court finds to be persuasive authority.[3] In that case, as in this one, the title policy at issue excepted from coverage defects or encumbrances "created, suffered, assumed or agreed to by the Insured." *Id.* at 769. The deed in *Lawyers Title* provided that the insured agreed to assume the obligation to pay off certain encumbrances, namely, four deeds of trust. And, like the present case, the title policy was issued after the insured purchased the land. *Id.* at 770. In explaining its decision that the insurer was not liable under the policy because the insured had "assumed or agreed to" the title defects—the four deeds

of trust—the Eighth Circuit Court of Appeals stated:

> The officers of Research were experienced in the real estate business and it taxes credulity to contend that they did not intend to assume obligations which they reasonably surmised had been placed against the property. We must emphasize that this was not an ordinary deed nor an ordinary title insurance transaction. The deed by which [the insured] expressly agreed to assume existing obligations was dated October 23, 1961, and was filed of record November 1, 1961. The application for title insurance was not made until November 6, 1961. If [the insured] had applied for title insurance prior to closing the deal we would have an entirely different situation. In that event, it would be reasonable to conclude that [the insured] was relying on the title insurer to advise it of the true state of the record title and intended to assume, in the context of the policy condition, only those obligations which the title search revealed. However, in this case the application for title insurance was made after the deal had been closed and there is no evidence showing that [the insured] was relying on the title insurer to advise it of encumbrances. The only possible conclusion is that the "assumed or agreed to" condition applies to the four [ ] deeds of trust since [the insured] did assume by deed all existing obligations, did not rely on the title insurer to advise it of encumbrances, and did have reason to believe the prior owners had placed such encumbrances on the property.

*Id.* at 769. This excerpt is an apt elaboration of this court's holding in the action *sub judice*.[4]

---

3. Global attempts to distinguish *Lawyers Title* from the present case by pointing out that the deed in *Lawyers Title* provided not only that the title policy holder would take the property "subject to" all defects and encumbrances but also that the policy holder "agrees to make payment on same, without any recourse against Grantors." In the present action, the warranty deed did not state that Global agreed to make payment on the six tax liens. It is the opinion of the court that this is a distinction without import. Whether Global agreed with Fletcher to pay the tax assessments is irrelevant because no matter which of these two corporate entities had *in*

*personam* liability for the liens, Global, in taking the warranty deed, accepted the possibility that the purchased property could be foreclosed for non-payment of the tax assessments.

4. As a defense to the logic of the *Lawyers Title* case, Global has repeatedly cited the old general rule that the insured's knowledge of a defect in title will not constitute a defense to a claim under the policy. But as explained by the Eighth Circuit, this weathered rule of law does not apply to today's modern title policies:

> It has been recognized consistently that title insurance is more than a contract of indemni-

As a final matter, the court will now address Count Two of plaintiff's Complaint wherein Commonwealth seeks reformation of the contract. This is an alternative remedy to a declaration that Commonwealth's title policy excludes coverage of the six Alabama tax liens. The rule governing the availability of reformation as a remedy in contract disputes was succinctly stated by the Alabama Supreme Court in *King v. Westbrook*, 358 So.2d 727, 729 (1978): "It has been the law of this State for quite some time that an instrument may not be reformed for a unilateral mistake absent fraud. Mutuality of mistake is required." (citing *Darden v. Meadows*, 68 So.2d 709 (Ala.1953)). In this case, the parties have stipulated that "Global made no mistake, nor did Global participate in or contribute in any way to such [Commonwealth's] mistake or oversight." Because there was no mutual mistake and because Commonwealth's unilateral mistake was not accompanied by fraud on the part of Global, reformation is not an available remedy.

### IV. CONCLUSION

In light of the foregoing, plaintiff's motion for summary judgment is due to be, and hereby is, **GRANTED** and defendant's motion for summary judgment is due to be, and hereby is, **DENIED.**

ty. Usually, the very purpose and essence of the title insurance transaction is to obtain a professional title search, opinion and guarantee. The policy of title insurance is in the nature of a warranty. *Empire Development Co. v. Title Guarantee & Trust Co.*, 225 N.Y. 53, 121 N.E. 468 (1918). This theory of the basic nature of title insurance has led to the enunciation of the rule, relied on heavily by appellee, that the insured's knowledge of a defect will not ordinarily constitute a defense to a claim under the policy. However, this rule was established in the context of title insurance policies that did not contain conditions similar to those in the present policy. These conditions [such as exclusions to encumbrances "created, suffered, assumed or agreed by the Insured"] clearly are intended to limit the title insurer's liability.

*Lawyers Title*, 361 F.2d at 767–768. Similarly, in *Lawyers Title Insurance Corporation v. D.S.C. of Newark Enterprises, Inc.*, 544 So.2d 1070, 1072–73, the Fourth District Court of Appeal of Florida noted several exceptions to the general rule. Among them, (1) that "since there is an element of reliance involved in the analysis of whether the title insurer should be held liable it is more difficult for an insured to recover where title is first taken and then title insurance is procured" and (2) that "courts have been loathe to impose liability on a title insurer for a condition of which the insured had actual, express knowledge." Both of these exceptions apply in the present case.