EVANDER, J.
David Nourachi, as trustee of The HWY 44 Lakefront Trust (“Nourachi”), timely appeals from a final judgment in favor of First American Title Insurance Company (“First American”) rescinding a title insurance policy. We affirm. The evidence supported the trial court’s conclusion that Nourachi had knowledge of an express defect in title to the property in question at the time he sought title insurance from First American and deliberately failed to disclose this information. Where a party does not rely on a title insurance company to advise it of encumbrances prior to acquiring title to property, it may not recover on a material title defect of which it had actual knowledge and which it failed to disclose to the insurer at the time it applied for the title policy.
The underlying cause proceeded to a non-jury trial on First American’s second amended complaint in which First American sought to rescind a title insurance policy it had issued to Nourachi. The facts, as found by the trial court, are set forth below:
In December 2002, for the sum of $22,600, Nourachi obtained a tax deed to certain unimproved real property located in Marion County. Nourachi then filed a quiet title action and obtained a default judgment on February 10, 2004. After the quiet title judgment was entered, Nourachi had “no trespassing” signs posted on the property. A forester with the United States Forest Service observed the signs on land that had long been part of the Ocala National Forest. On March 9, 2004, the United States Forest Service sent Nourachi a letter demanding that the signs be removed and notifying Nourachi that the land had been part of the Ocala National Forest since January 1937 when the United States purchased the tract from C.A. Savage, Jr. The following day, two of Nourachi’s agents, Leo Nourachi and Sam Zalloum, met with officials of the Marion County Property Appraiser’s Office. At the meeting, Nourachi’s agents were advised that the county had made a mistake in adding the property to the county tax rolls and subjecting it to a tax sale because the property was actually owned by the United States. The subject property (along with other land) had been conveyed to the United States by C.A. Savage, Jr., and his wife, Dorothy Savage, on January 19, 1937, pursuant to a deed that had been recorded in Marion County’s public rec *604 ords. The County officials offered to refund Nourachi his money.[1]
Immediately after the meeting, the “no trespassing” signs were removed from the property. Approximately one week later, a copy of the 1937 deed from the Savages to the United States was faxed to Zalloum. Zalloum then contacted a land surveyor, Larry Efird, Jr., to obtain a boundary survey for the property. Efird was provided with both a copy of the 1937 deed and the tax sale deed. At Zalloum’s request, Efird sketched out the property described in the 1937 deed and his drawing reflected that at least a part of the property described in the 1937 deed fell within the property described in the tax deed. Efird quoted Zalloum a $3,000 fee to complete an actual survey. However, Noura-chi did not retain Efird to perform an actual survey until December 2008 — well after the commencement of the instant lawsuit.
In August 2004, Nourachi contacted First American, represented himself as the owner of the subject property, and requested First American issue a title insurance policy in the amount of $550,000. Nourachi deliberately failed to disclose the existence of the United States’ claim to the property and First American negligently failed to discover same. As a result, First American issued a title policy to Nourachi in the requested amount. Approximately one year later, at Nourachi’s request, the amount was increased to 1.3 million dollars. First American would not have issued the title policy if it had known of the United States’ claim.
In June 2006, after Marion County refused to accept Nourachi’s tax payment, Nourachi notified First American that the United States claimed ownership of the property. On October 5, 2006, First American filed a one count complaint against Nourachi seeking a declaration of its rights under the policy. In January 2007, First American filed an amended complaint, again asserting a single count for declaratory judgment. On July 9, 2008, First American filed a motion to amend its complaint to add a count for rescission. The motion was granted[2] and trial was held on June 10, 2009.
In entering judgment in favor of First American, the trial court found that Nour-achi should not benefit by deliberately concealing a known, express defect in the title and then argue that the insurer should have been more circumspect or astute in performing its title search duties. The trial court granted First American’s claim for rescission and directed First American to refund any title insurance premiums paid within thirty days.
On appeal, Nourachi argues that he had no duty to disclose facts that First American could, by its own diligence, have discovered in this arms-length transaction. Nourachi contends that a title company should not avoid liability when a defective condition of title, not excepted from coverage, subsequently causes a loss to the insured even though the insured knew of the particular defect. We reject Nourachi’s argument and conclude that where an insured purchases property, subsequently learns of facts establishing that he does not have good title to the property, and then seeks title insurance without disclosing this known, express defect in title to *605 the insurer, he is not entitled to recover under the policy.
In reaching our conclusion, it is important to recognize the general nature and purpose of title insurance. Usually, a prospective purchaser of title insurance avails himself of a title insurance company’s services prior to acquiring title to property for which he is seeking to have title insured. The prospective purchaser will typically lack knowledge of encumbrances which may cloud the title and, accordingly, will employ the services of the title insurance company so that he can learn whether encumbrances exist and to obtain insurance against those claims against title that may arise after issuance of the policy. The title company is to perform a title search and advise the prospective purchaser of any encumbrances upon the land that are revealed by the search. Thus, the prospective purchaser will typically rely on the title insurance company’s expertise in searching the records and its willingness to issue a title policy in making a final decision as to whether to purchase a particular piece of real estate. Commonwealth Land Title Ins. Co. v. Ozark Global, L.C., 956 F.Supp. 989 (S.D.Ala.), aff'd, 127 F.Sd 41 (11th Cir.1997).
In recognition of a prospective purchaser’s presumed reliance on a title company’s search, the general rule is that where a title company issues a policy in conjunction with the insured’s purchase of property, the title company is obligated to answer for any defect that is a matter of public record which is not excepted by the policy. See Parker v. Ward, 614 So.2d 975, 977 (Ala.1992); Lawyers Title Ins. Corp. v. D.S.C. of Newark Enters., Inc., 544 So.2d 1070, 1072 (Fla. 4th DCA 1989). This rule has been found to apply even where the insured is alleged to have had actual knowledge of a material defect in title at the time of closing. L. Smirlock Realty Corp. v. Title Guarantee Co., 52 N.Y.2d 179, 487 N.Y.S.2d 57, 418 N.E.2d 650, 654 (1981).
However, where an insured does not apply for or receive a title insurance policy (or otherwise request a title search) from an insurer until after he has acquired title to the property, the insured’s failure to disclose a material defect in title of which the insured had actual knowledge will preclude coverage. Ozark Global; Pioneer Nat’l Title Ins. Co. v. Lucas, 155 N.J.Super. 882, 382 A.2d 933 (N.J.Super.Ct.App.Div.), aff'd, 78 N.J. 320, 394 A.2d 360 (1978).
In Ozark Global, Fletcher Oil Company executed and delivered a warranty deed to Ozark Global L.C. (“Global”) conveying certain real property in Mobile County, Alabama. The deed was expressly made subject to six state of Alabama revenue tax liens against Fletcher Oil Company, which secured an indebtedness in excess of $50,000. Global subsequently applied for a title insurance policy from Commonwealth. Commonwealth issued a title policy, which, through inadvertence or oversight, failed to list as exceptions those State of Alabama Department of Revenue tax liens that had been set forth in the deed but had not been released. The parties stipulated that Global knew or should have known at all applicable times that such liens had not been released. Global further acknowledged that it had not relied to its detriment on Commonwealth’s failure to except those tax liens from the policy. Nevertheless, Global contended that Commonwealth was responsible for the liens based on the language of the policy.
In resolving the case in favor of Commonwealth, the court emphasized that Global did not rely on Commonwealth to advise it of encumbrances on the property, stating:
*606 Global’s non-reliance upon Commonwealth for advisement as to whether the purchased land was encumbered is of utmost importance, for this fact displaces the general rule that a title insurer is liable for all title defects not specifically listed as exceptions to coverage.
Id. at 992.
The court observed that the purpose of title insurance is to protect a purchaser of real estate against title “surprises.” When an insured has already purchased the property and is aware of title defects prior to applying for a title policy “it cannot be said that the insured will experience ‘surprise’ when the title insurance policy does not list the known encumbrance as an exception to coverage.” Id.; see also D.S.C. of Newark Enters., Inc., 544 So.2d at 1072-73 (“Also, since there is an element of reliance involved in the analysis of whether the title insurer should be held liable it is more difficult for an insured to recover where title is first taken and then title insurance is procured.”)
The dissent attempts to distinguish Commonwealth by arguing that the title defects in question were the subject of an exclusion provision in the policy. In fact, the primary basis of the court’s decision was as described above. The court only addressed the exclusion provision of the policy toward the end of its opinion as an alternative ground for its decision. “Alternatively, the court holds that the six tax liens fell within the ‘created, suffered, assumed or agreed to by the insured claimant exclusions in the title policy....’” 956 F.Supp. at 993 (emphasis added). The dissent’s attempt to distinguish Ozark Global is actually a request to ignore what the Ozark Global court itself deemed to be the primary holding of the case.
In Lucas, the public records reflected that Lucas owned certain property on which she had been paying taxes for several years. She then learned that approximately thirteen acres of her property was apparently owned by a neighbor. The title defect occurred because sometime in the 19th Century, the insured’s predecessors in title twice conveyed the subject property. In the second conveyance (to Lucas’ predecessor), they were attempting to pass title to land they did not own. Armed with this information, the insured contacted Pioneer Title and requested a sixty-year title search. Not surprisingly, the sixty-year title search performed by Pioneer did not uncover the defect in Lucas’ title. After receiving the sixty-year title search, Lucas then obtained a title insurance policy from Pioneer. When the neighbor subsequently brought a quiet title action against Lucas, Pioneer sought to rescind the title policy. The trial court denied Pioneer’s claim, finding that no fraud had been committed by the insured. The appellate court reversed, finding that the record established “beyond question” that the policy was procured by half-truths and concealment. The court found that the insured had deliberately failed to disclose to Pioneer known matters relating to the title, material to the risk insured against, and as part of the design to mislead the insurer into issuing a substantial policy. The appellate court further observed that the insured had lulled Pioneer into a false sense of security by suggesting that a sixty-year search would be sufficient. Like Noura-chi, Lucas argued that she was under no duty to disclose to the insurer those defects that appear in the public records. The court concluded that one who engaged in the above-described conduct may not urge that her victim should have been more circumspect or astute. 382 A.2d at 342.
The dissent attempts to distinguish Lucas by categorizing it as a “garden variety *607 fraud case” because Lucas’ agent went beyond simple non-disclosure by initially only requesting a sixty-year title search and suggesting that a sixty-year title search should be sufficient. The dissent ignores the distinction between a request for a title search and a title policy. Lucas requested and Pioneer provided a sixty-year title search. Based on Lucas’ request, Pioneer was not required to do more at that time. However, when Lucas subsequently applied for a title policy, Pioneer was obligated to search further and was negligent if it failed to do so. Notwithstanding that negligence, the court determined that Lucas’ claim must fail because of her intentional failure to disclose the known material defect in title. The dissent’s argument is also internally inconsistent. On the one hand, the dissent calls Lucas a “garden variety fraud case.” On the other hand, it contends that fraud cannot be found where the insured makes representations that are refuted by recorded documents in the chain of title — the type of representations made by Lucas’ agent.
The Lucas decision was based primarily on the insured’s intentional failure to disclose a material defect in title at the time she sought to obtain a policy on property she had already acquired. Lucas’ agent’s aforedescribed actions were evidence that Lucas had actual knowledge of the defect and refused to disclose same in the hope that the title search performed by Pioneer in conjunction with the request for the title policy would be deficient.
Our decision is also consistent with the general principle that a party may not insure against a loss that he knows has already occurred and that he fails to disclose to the insurer. Mass. Bonding & Ins. Co. v. Hoxie, 129 Fla. 332, 176 So. 480, 482 (1937); see also Nat’l Life Ins. Co. v. Harriott, 268 So.2d 397, 400 (Fla. 2d DCA 1972). In Hoxie, the insured had permitted two premises liability insurance policies to expire. Approximately two months later, an individual was injured on the premises by a falling light fixture. Immediately after learning of the occurrence of this incident, the insured paid a new premium and had the policies reinstated effective back to the initial expiration date. The insured failed to advise the insurance company of the above-described incident. Our supreme court determined that the insurer was entitled to a cancellation of the policy because the insured’s non-disclosure constituted a fraudulent concealment of a material fact which was equivalent to a false representation that the fact did not exist. The court cited with approval to the following language from Joyce on Insurance (1st Ed.) Vol. 1 page 159, section 99:
If the delivery [of an insurance policy] be obtained by misrepresentation or fraud, it can have no effect as a binding contract, as in case the assured has knowledge of the loss at the time the application is made and conceals the fact.
Hoxie, 176 So. at 482.
The dissent attempts to limit Hoxie’s holding to situations where the insured had “superior knowledge not available to the other party.” However, there is no such limitation expressed in Hoxie. Indeed, the insurer in Hoxie could have placed itself in an equal position of knowledge with regard to the claim in question by simply “asking the right questions” in its application form. Alternatively, the insurer could have neutralized the superior knowledge position of the insured by inserting an appropriate exclusion provision in the policy. Our supreme court did not require the insured to do either — thereby reflecting that its decision was not based on the comparable positions of knowledge of the insurer and the insured.
*608 Our sister court in Harriott properly concluded that the Home decision was based on the general principle that an insured cannot seek to insure against a loss known by the insured but not disclosed to the insurer. Citing to Hoxie, the court stated:
Settled law forbids insuring against a loss which the insured knows has already occurred and which he fraudulently conceals from the insurer. Sound policy forbids procuring insurance against a reasonably certain loss in the immediate future without disclosing the risk.
Harriott, 268 So.2d at 400 (footnote omitted).
Here, the facts amply support the trial court’s determination that Nouraehi had knowledge of an express defect in title at the time he sought a policy from First American. Indeed, the very entity that sold the property to Nouraehi specifically advised him that it (Marion County) did not have good title at the time of the conveyance. Immediately thereafter, Nouraehi was provided a copy of the 1937 Savage deed to the United States confirming Nourachi’s lack of good title. Noura-chi then delayed the actual employment of a surveyor after being advised by the surveyor that at least part of the property he had obtained by tax deed was encompassed within the legal description set forth in the 1987 deed.
Furthermore, the United States’ claim against Nourachi’s property interest had fully matured by the time Nouraehi had applied for a title policy. The United States had notified Nouraehi in writing that it had a superior claim to the subject property pursuant to the 1937 deed that had been recorded in Marion County’s Public Records. The United States had further made written demand upon Noura-chi to remove personal property (the “No Trespassing” signs) that he had placed on the disputed parcel. Thus, we face the issue of whether a party having actual knowledge of a specific claim against his existing property interest has a duty to disclose that information where the claim has matured to the extent that the insurer’s duty to defend against that specific claim would come into existence the instant the policy was issued. We believe, and Hoxie strongly suggests, that the answer is “yes.” Ozark Global and Lucas reached the same conclusion. Notably, the dissent has failed to cite to a single case that answered this question in the negative.[3]
The dissent also suggests that the title policy in question expressly provides coverage for defects of which the insured had actual knowledge and which could be discovered in the public records. It does not. The policy simply excludes from coverage title defects of which the insured had actual knowledge and which are not recorded in the public records. As explained supra, the insured’s obligation to disclose title defects of which the insured had actual knowledge and which are recorded in the public records is dependent on when the title policy was procured and whether the insured presumptively relied on the insurer’s title search. See Ozark *609 Global, 956 F.Supp. 989; D.S.C. of Newark Enters., Inc, 544 So.2d 1070.
Regardless, the dissent’s suggestion that this case be determined solely on contract language was effectively rejected by our supreme court in Hoxie. In Hoxie, the literal language of the policy would apparently have provided coverage. Alternatively, the supreme court could have determined that to preclude liability, the insurer in Hoxie should have inserted an appropriate exclusion provision in the policy. Instead, the supreme court imposed a duty to disclose on the insured. The imposition of this duty was recognition that an insurance policy is designed to protect an insured against a potential risk — -not to provide compensation for a claim that has already been made against the insured at the time the policy is sought.
The dissent also argues that Hoxie is distinguishable because it involves an indemnity policy rather than a title policy. There are valid policy reasons to treat the two policies differently when an insured procures a title policy in conjunction with the acquisition of an interest in property. In that situation, it is appropriate to presume that the insured has relied upon the title company’s expertise in searching the public records. Additionally, prior to closing, the insured will ordinarily not have a property interest against which a third party may make a claim. Where there is no reliance by the insured on the insurer’s search and a claim has already been made against the insured’s property interest, there is no valid reason to depart from the general principle articulated in Hoxie and Harriott.
This is not a case of a party seeking to insure against the risk of a potential adverse claim. In fact, under Nourachi’s legal theory, he had a valid claim against First American the instant it issued its policy. Nor is this a situation in which a party relied on a title company to properly perform a title search. Rather, the evidence suggests that Nourachi hoped that First American’s title search would be deficient so as to afford him the opportunity to seek a recovery on a title policy.
To accept Nourachi’s argument would promote unsavory gamesmanship. For example, a party having actual knowledge of its defective title (but refusing to disclose same) could seek title insurance from one insurer after another until eventually finding an insurer that negligently failed to discover the title defect, and then make a claim on that insurer’s subsequently-issued policy. The law should not encourage this type of conduct.
AFFIRMED.
LAWSON, J., concurs specially with opinion.
TORPY, J., dissents with opinion.

. Marion County issued a "Certificate of Correction” in October 2005.

. We find no merit to Nourachi's argument that First American lost any right it had to rescind the title policy by failing to promptly seek rescission. Nourachi did not suffer any prejudice from First American's delay in seeking to amend its complaint to add a count for rescission.