BENTON, C.J.
Interstate Fire & Casualty Company (Interstate) appeals (antecedent summary judgments and) the final judgment against it awarding Tatiana Abernathy $6,250,430.[1] The trial court ruled that a certificate of insurance a broker issued on April 18, 2007, conferred coverage on a purported additional insured for liability for an injury alleged to have occurred four days earlier, *354 on April 14, 2007. We reverse and remand for entry of summary judgment in favor of Interstate, and against Ms. Abernathy, on all claims predicated on the putative liability of the Choctaw Touchdown Club (Club).
“[L]osses which exist at the time of the insuring agreement, or which are so probable or imminent that there is insufficient ‘risk’ being transferred between the insured and insurer, are not proper subjects of insurance” 7 Lee R. Russ in consultation with Thomas F. Segalla, Couch on Insurance § 102:8 (3d ed.2011). “Public policy considerations and the general nature of insurance prevent an insurance policy from providing coverage for a policyholder’s losses unless those losses are fortuitous.” M. Elizabeth Medaglia & 3 Marc A. Peritz, Law & Practice of Insurance Coverage Litigation § 35:3 (2011).
One of the fundamental assumptions deeply embedded in insurance law is the principle that an insurer will not pay for a loss unless the loss is “fortuitous,” meaning that the loss must be accidental in some sense. The public policy underlying the fortuity requirement is so strong that if the insurance policy itself does not expressly require that the loss be accidental courts will imply such a requirement. The fortuity principle is often expressed with reference to certainty: losses that are certain to occur, or which have already occurred, are not fortuitous. In some jurisdictions, the fortuity doctrine is codified.78
78. See, e.g.:
CA — Cal. Ins.Code § 22 (“Insurance is a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event”);
NY — N.Y. Ins. Law § 1101[a] (“ ‘Insurance Contract’ means any agreement or transaction whereby one party, the insurer, is obligated to confer a benefit of pecuniary value upon another party, the insured or beneficiary, depending upon the happening of a fortuitous event”).
1 Robert H. Jerry, II, New Appleman on Insurance Law Libra'ry Edition § 1.05(2)(a) (2009) (footnote omitted).[2] See also Nat’l Union Fire Ins. Co. of Pittsburgh, PA. v. Stroh Cos., Inc., 265 F.3d 97, 107 (2d Cir.2001) (holding “fortuity and known loss principles are integral to the nature of insurance and thus apply as a matter of public policy, irrespective of specific [insurance] policy terms”); Intermetal Mexicana, S.A. v. Ins. Co. of N. Am., 866 F.2d 71, 77 (3d Cir.1989) (“It is generally recognized that it is against public policy to allow insurance coverage on a certainty.”).
On April 14, 2007, the Club conducted a fundraiser it called the Jellyfish Festival. Emerald Coast Entertainment, LLC (Emerald Coast) supplied recreational gear for the festival, including an “inflatable bungee run,” manufactured by Funtastic Factory, Inc. (Funtastic), on which Dakota *355 Abernathy (14 years old at the time) was allegedly seriously injured. The Club did not have liability insurance coverage at the time of the accident, and had made no application, request or agreement concerning such coverage.
Emerald Coast was, however, insured under a policy issued by Interstate,[3] which included an endorsement entitled “ADDITIONAL INSURED — OWNERS, LESSEES OR CONTRACTORS — SCHEDULED PERSON OR ORGANIZATION.” The endorsement provided that “Who is An Insured” under the policy was “amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of your ongoing operations performed for that insured.” No person or organization was named or scheduled. But the Schedule, under the heading “Name of Person or Organization,” contained this language: “AS REQUIRED BY WRITTEN CONTRACT.” At the time of the accident, Emerald Coast had no written contract with the Club, nor did the Club have any agreement concerning liability insurance, written or oral, either with Emerald Coast or Interstate.
On Monday, April 16, 2007, two days after the accident, a representative of the Club contacted Jack Jernigan, owner of Emerald Coast, and requested a certificate of insurance naming the Club as an additional insured under Emerald Coast’s policy. Mr. Jernigan forwarded the request to Dick Wardlow Insurance Brokers (Wardlow), the insurance broker that had procured the Interstate liability policy for Emerald Coast. Wardlow prepared and faxed to the Club a form certificate of insurance on April 18, 2007, which stated that the certificate “CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER”[4] but also stated that the Club “is named as additional insured” for “[o]p-erations at Jelly Fish Festival on 4/13/07 to 4/14/07.”
On August 20, 2009, Ms. Abernathy filed suit against Emerald Coast, the Club, and Funtastic, stating negligence and products liability claims. Interstate undertook defense of Emerald Coast, but notified the Club that it would not defend Ms. Abernathy’s claims against the Club. On Novem *356 ber 30, 2009, Ms. Abernathy and the Club entered into a settlement agreement under which the Club consented to entry of judgment for $6.25 million. As part of the same agreement,[5] the Club assigned to Ms. Abernathy all of its rights under the Interstate policy, and Ms. Abernathy agreed not to execute the judgment against the Club. The trial court entered judgment on the same date, which recited and adjudged: “[T]he Court being fully advised and having reviewed the Joint Stipulation and Agreement between the parties and having approved the same,” the “[plaintiffs ... shall recover from Defendant, CHOCTAW TOUCHDOWN CLUB, INC., ... the sum of $6,250,000.00 with costs in the sum of $480.”
Ms. Abernathy then filed an amended complaint on December 18, 2009, adding Interstate as an additional defendant and alleging breach of contract, statutory bad faith,[6] and common law bad faith based on Interstate’s “wrongful decision to deny both a defense and coverage to defendant Choctaw Touchdown Club, Inc., although this Defendant was clearly entitled under the terms and conditions of the subject policy to both.” The amended complaint alleged that Ms. Abernathy was entitled to receive from Interstate the full amount of the judgment rendered against the Club. The certificate of insurance issued four days after the event was the sole basis upon which coverage for the Club was alleged.[7]
Ms. Abernathy and Interstate then filed a series of motions for summary judgment. Ms. Abernathy asserted there were no genuine issues of material fact and that coverage existed for the Club under the Interstate policy, that Interstate wrongfully refused to defend the Club, and that the settlement between Ms. Abernathy and the Club was reasonable and made in good faith. Interstate opposed these motions and filed its own motion for summary judgment, arguing that the certificate of insurance (COI) clearly stated it was “issued as a matter of information only” and did not “amend, extend or alter the coverage afforded” by the policy; that the COI issued after the alleged injury; that there was no privity of contract between Interstate and the Club at the time the injury occurred, and that the Club could not acquire insurance to cover an injury that had already occurred. Interstate also contended that Ms. Abernathy had not presented any evidence that the amount of damages set out in the settlement agreement was objectively reasonable and agreed to in good faith.
On April 29, 2010, the trial court denied Ms. Abernathy’s motion for summary judgment as to coverage under the policy, but granted summary judgment in favor of Ms. Abernathy on the issue of the reasonableness of the Coblentz settlement agreement. On July 7, 2010, the trial court denied Ms. Abernathy’s renewed motion for summary judgment regarding coverage. But on August 24, 2010, the trial court granted summary judgment in favor of Ms. Abernathy, ruling the Interstate policy covered the Club, on grounds that *357 Wardlow, as an insurance broker, had authority to issue the COI, that the COI was part of the policy, based on the definition of “policy” in section 627.402, Florida Statutes (2006), and that there was no reason why an injured party could not acquire insurance coverage after the fact of the injury:
4. § 627.402, Fla. Stat., defines “policy” as “a written contract of insurance or written agreement for or effecting insurance, or the certificate thereof, by whatever name called, and includes all clauses, riders, endorsements, and papers which are a part thereof.”
5. The undisputed testimony of Barbara Robedee provides that Dick Ward-low Insurance Brokers had the authority to issue the certificate of insurance at issue. The only dispute is the effect of the certificate. As stated above, by statute they are considered a part of the policy.
6. The certificate clearly describes the coverage it provides as including the dates and activities at issue in this case.
7. The Court has struggled with several issues raised in this case. In multiple foreign state jurisdictions the outcome would be different based on their treatment of certificates of insurance and on the “known loss” rule. Florida Courts do not appear to have adopted the “known loss” rule found in these other jurisdictions. Even though it seems evident that a sound public policy argument could be made against post-injury insurance, this Court can find no appellate support for any similar rule or public policy in Florida that would override a party’s freedom of contract.
(footnotes omitted). The trial court denied Interstate’s motion for summary judgment, and, on February 2, 2011, granted Ms. Abernathy’s motion for summary judgment on the breach of contract count of the amended complaint[8] and entered judgment in favor of Ms. Abernathy in the amount of $6,250,430. On March 14, 2011, the trial court entered an amended final summary judgment against Interstate, awarding Ms. Abernathy $6,250,430 plus interest in the amount of $642,511.24, reserving jurisdiction to determine fees and costs in the event the parties were unable to agree.
“Summary judgment is proper [only] if there is no genuine issue of material fact and if the moving party is entitled to a judgment as a matter of law. Thus, our standard of review is de novo.” Volusia Cnty. v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000) (citation omitted). See also Liebel v. Nationwide Ins. Co. of Fla., 22 So.3d 111, 114-15 (Fla. 4th DCA 2009) (holding “ ‘construction of an insurance policy is a question of law for the court and is subject to de novo review’ ” (quoting Flaxman v. Gov’t Emps. Ins. Co., 993 So.2d 597, 599 (Fla. 4th DCA 2008))); Cox v. CSX Intermodal, Inc., 732 So.2d 1092, 1095-96 (Fla. 1st DCA 1999) (“When a defendant moves for summary judgment, ‘[t]he function of the court is solely to determine whether the ... record presented in support of summary judgment conclusively shows that the plaintiff cannot prove the claim alleged as a matter of law.’ ” (quoting Hervey v. Alfonso, 650 So.2d 644, 646 (Fla. 2d DCA 1995))).
The COI issued on April 18, 2007, stated in boldface type that it did not confer new coverage, and it could not then have conferred coverage on the Club for injuries sustained by Dakota Abernathy as *358 a result of the accident on April 14, 2007, four days earlier. If construed as an agreement to pay a loss already incurred, it would be contrary to important public policy.[9] Florida’s insurance laws embody the fortuity and known loss principles, precluding coverage for losses that have already taken place. “Insurance” is defined as “a contract whereby one undertakes to indemnify another or pay or allow a specified amount or a determinable benefit upon determinable contingencies.” § 624.02, Fla. Stat. (2006).[10] The explicitly stated purpose for regulating insurance is to “promote the public welfare by regulating insurance rates ... to the end that they shall not be excessive, inadequate, or unfairly discriminatory,” and to “protect policyholders and the public against the adverse effects of excessive, inadequate, or unfairly discriminatory insurance rates.” § 627.03l(l)-(2), Fla. Stat. (2011).
To qualify for and hold a certificate of authority,[11] an insurer must maintain reserves and surpluses. See §§ 624.404 & 624.408, Fla. Stat. (2011). The Legislature established the Florida Financial Services Commission, whose purpose is to “safeguard the public by regulating the banking, securities, and insurance industries.”[12] The Commission oversees the Office of Insurance Regulation, whose purpose is to “protect[ ] the public through oversight of insurance company solvency, and market conduct performance,” [13] and “[t]o ensure that insurance companies licensed to do business in Florida are financially via *359 ble.”[14] The Insurers Rehabilitation and Liquidation Act was enacted to “[p]rotect the interests of policyholders, creditors, and other claimants and the public.” § 6S1.001(3)(a), Fla. Stat. (2011). The Florida Insurance Guaranty Association Act was enacted to “avoid financial loss to claimants or policyholders because of the insolvency of an insurer,” “[ajssist in the detection and prevention of insurer insolvencies,” and “[a]ssess the cost of such protection among insurers.” § 631.51(1)-(4), Fla. Stat. (2011). This Act established the Florida Insurance Guaranty Association (FIGA) to handle claims of insolvent property and casualty insurance companies “for the benefit of Florida residents.”[15]
The rule forbidding “insuring against” known losses is part and parcel of the public policy to protect other policy holders against insolvent insurers. An agreement to assume a known loss is not insurance. “The concept of insurance is that the parties, in effect, wager against the occurrence or non-occurrence of a specified event; the carrier insures against a risk, not a certainty.” Bartholomew v. Appalachian Ins. Co., 655 F.2d 27, 29 (1st Cir.1981). “Whether the contract is one of insurance or of indemnity there must be a risk of loss to which one party may be subjected by contingent or future events and an assumption of it by legally binding arrangement by another. Even the most loosely stated conceptions of insurance and indemnity require these elements]. Hazard is essential.... If there is no risk, ... there can be [no] insurance.” Jordan v. Group Health Ass’n, 107 F.2d 239, 245 (D.C.Cir.1939). “The principle of public policy that insurance should only cover fortuitous losses is universally recognized.” Scott C. Turner, Insurance Coverage of Construction Disputes § 3:18 (2011).
That Emerald Coast disclosed the fact that Dakota had been injured at the festival to Wardlow before Wardlow issued the COI makes no difference. While the holding in Nourachi v. First American Title Insurance Co., 44 So.3d 602, 607 (Fla. 5th DCA 2010), rested on “the general principle that a party may not insure against a loss that he knows has already occurred and that he fails to disclose to the insurer,” more is at issue, as observed by Judge Lawson:
This basic doctrine does not arise from a desire to protect an individual insurance company from something akin to fraud, ... but from a recognition that “the insured’s risk is, in a real sense, borne by the insurer’s policyholders as a group, from whose pool of premiums all claims must be paid if the insurer is to remain in business.” In other words, because society as a whole relies on insurance, public policy will not permit a transaction that is anathema to the very concept of insurance which, if allowed in the aggregate, could put insurance at risk for all.
Id. at 610 (Lawson, J., concurring) (citation omitted). See also Burch v. Commonwealth Cnty. Mut. Ins. Co., 450 S.W.2d 838, 840-41 (Tex.1970) (“[I]t is contrary to public policy for an insurance company, *360 the business of which is affected with a public interest, knowingly to assume the burden of a loss that occurred prior to making the contract. This is the basis of the statements found in some opinions that an agent has no authority to issue a policy to cover a known loss.”).
The COI was not “a contract whereby [Interstate undertook] to indemnify [the Club] or pay or allow a specified amount or a determinable benefit upon determinable contingencies,” and therefore it did not meet the definition of “insurance.” At the time the Club requested the COI, it knew Dakota had suffered an injury at the festival it sponsored and that the Club would be legally responsible for any negligence on the part of the Club. See Standard Structural Steel Co. v. Bethlehem, Steel Corp., 597 F.Supp. 164, 191 (D.Conn.1984) (“Damage which is certain and inevitable and which ... proceeds from an inherent vice or infirmity present at the time that the policy was issued as a veritable time-bomb, already set and ticking, ... is not the result o'f a casualty and cannot be covered.”); USAA Cas. Ins. Co. v. McInerney, 355 Ill.Dec. 773, 960 N.E.2d 655, 664 (Ill.App.Ct.2011) (Under the loss-in-progress or “known loss” doctrine, “ ‘[i]f the insured knows or has reason to know, when it purchases a comprehensive general liability policy, that there is a substantial probability that it will suffer a loss, the risk ceases to be contingent and becomes a probable or known loss that will not be covered by the policy.’ For example, a homeowner cannot insure against flood damage when flooding has already occurred.” (citation omitted)); In re Tex. Ass’n of Sch. Bds., Inc., 169 S.W.3d 653, 658 (Tex.2005) (“In an insurance arrangement, the insurer is not promising to compensate the insured for an actual, expensive loss in exchange for the relatively small, individual premium paid by the insured. Rather the insurer is assuming the risk ... loss may occur.”). The COI prepared on April 18, 2007, was not effective to create coverage for the Club for an event which had occurred four days before the COI issued.
The final judgment is reversed, and the case is remanded with directions to enter judgment in favor of Interstate, and against Ms. Abernathy, on all claims predicated on the Club’s putative liability.
WETHERELL and RAY, JJ., concur.

. Judgment was entered in her favor individually and as mother and natural guardian of Dakota Abernathy.

. See also, e.g., Alaska Stat. § 21.97.900(25) (2011) (defining insurance as “a contract whereby one undertakes to indemnify another or pay or provide a specified or determinable amount or benefit upon determinable contingencies”); Ga.Code Ann. § 33-1-2(2) (2011) (" 'Insurance' means a contract which is an integral part of a plan for distributing individual losses whereby one undertakes to indemnify another or to pay a specified amount or benefits upon determinable contingencies."); Md.Code Ann., Ins. § 1-101(s) (West 2011) (Insurance is "a contract to indemnify or to pay or provide a specified or determinable amount or benefit on the occurrence of a determinable contingency.”); Or.Rev.Stat. § 731.102(1) (2011) ("Insurance” means "a contract whereby one undertakes to indemnify another or pay or allow a specified or ascertainable amount or benefit upon determinable risk contingencies.”).

. The Interstate policy stated bodily injury liability limits of two million dollars in the aggregate and one million dollars per occurrence.

. The certificate of insurance prepared on April 18, 2007, stated, in part:
THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER.... THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.
[[Image here]]
THIS IS TO CERTIFY THAT THE POLICIES OR INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN. THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY BE REDUCED BY PAID CLAIMS.
[[Image here]]
DESCRIPTION OF OPERATIONS/LOCATIONS/ VEHICLES/SPECIAL ITEMS Choctaw Touchdown Club is named as additional insured, but only insofar as the operations under this contract are concerned.
Operations at Jelly Fish Festival on 4/13/07 to 4/14/07 1 — Rock Wall 1-22' Slide 1-30' x 16' Obstacle Course 1-3 Person Bungee Run 1-3 in 1 Space Jump 1-2 Person Power Jump

. The parties have referred to this type of agreement as a Coblentz agreement. See Perera v. U.S. Fid. & Guar. Co., 35 So.3d 893, 899-900 (Fla.2010) (citing Coblentz v. Am. Sur. Co. of N.Y., 416 F.2d 1059 (5th Cir.1969)).

. See §§ 624.155(1)(b) 1. & 626.9541, Fla. Stat. (2009).

.The Club did not assert any written contract between Emerald Coast and the Club, and no evidence suggests that Emerald Coast had orally promised or had, prior to the accident, been requested to add the Club as an additional insured.

. The bad faith counts stated in the amended complaints had been dismissed without prejudice.

."When determining whether a contract violates public policy, it is necessary to carefully balance the public interest with the right to freely contract. Bituminous Cas. Corp. v. Williams, 154 Fla. 191, 17 So.2d 98, 101-02 (1944). When a contract 'is not prohibited under [a] constitutional or statutory provision, or prior judicial decision, it should not be struck down on the ground that it is contrary to public policy, except it be clearly injurious to the public good or contravene some established interest of society.' Id. at 101.” Johnson, Pope, Bokor, Ruppel & Burns, LLP v. Forier, 67 So.3d 315, 318 (Fla. 2d DCA 2011). See Gessa v. Manor Care of Fla., Inc., 86 So.3d 484 (Fla. 2011) (holding that whether the limitation of liability provisions in arbitration agreement violate public policy is a pure question of law); Chandris, S.A. v. Yanakakis, 668 So.2d 180, 185 (Fla.1995) ("A contract that contravenes an established interest of society can be found to be void as against public policy.”); Am. Cas. Co. v. Coastal Caisson Drill Co., 542 So.2d 957, 958 (Fla.1989) ("We can, however, find a contract that contravenes an established interest of society void as against public policy.”). See also United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 42-44, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) ("[A] court may refuse to enforce contracts that violate law or public policy. That doctrine derives from the basic notion that no court will lend its aid to one who founds a cause of action upon an immoral or illegal act, and is further justified by the observation that the public’s interests in confining the scope of private agreements to which it is not a party will go unrepresented unless the judiciary takes account of those interests when it considers whether to enforce such agreements.... [The public] policy must be ‘ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests.” ’ " (citations omitted)).

. "Contingency" is defined as “[a]n event that may or may not occur; a possibility,” and the "condition of being dependent on chance; uncertainty.” Black’s Law Dictionary 315 (7th ed.1999). "Contingent” is defined as "[p]ossible; uncertain; unpredictable” or "conditional.” Id.

. The Florida Legislature has preempted the field of regulating insurers and their agents and representatives, and no person may transact insurance without complying with applicable statutory provisions and obtaining a certificate of authority. See §§ 624.11 & 624.401, Fla. Stat. (2011).

. Florida Financial Services Commission, http://www.oppaga.state.fl.us/profiles/4137/ (last visited May 1, 2012).

. Id.

. Florida Office of Insurance Regulation Mission Statement, http://www.floir.com/ Office/MissionStatement.aspx (last visited May 1, 2012).

. Florida Insurance Guaranty Association, http://www.figafacts.com/ (last visited May 1, 2012). "Since inception of the property and casualty guaranty association system, there have been about 600 insolvencies. In all, the system has paid out about $24.2 billion.” Florida Insurance Guaranty Association, Frequently Asked Questions, http://www.figafacts. com/faq (follow "How prevalent are insurance insolvencies?”) (last visited May 1, 2012).