268 So.2d 397 (1972)
The NATIONAL LIFE INSURANCE COMPANY of Florida and Central Plaza Bank and Trust Company, Appellants,
v.
Robert J. HARRIOTT, Appellee.
No. 70-602.
District Court of Appeal of Florida, Second District.
November 8, 1972.
John T. Allen, Jr., and Harrison, Greene, Mann, Davenport, Rowe & Stanton, St. Petersburg, for appellants.
Gerald R. Colen, St. Petersburg, for appellee.
MANN, Judge.
We must determine whether fraudulent concealment of a factor material to the risk is a defense to an action on a credit life insurance policy under any circumstances, and, if so, under what circumstances. The cases are legion holding that the carrier may plead in defense or mitigation the insured's fraudulent concealment of factors affecting the risk as to most forms of insurance coverage.[1] But credit life is no ordinary form of insurance. Our sister court in the Third District has recently held that an insured who had had a previous heart attack from which he had apparently recovered was fully protected under a credit life policy, although he died ten days after the policy was issued of a "sudden cardiac arrest."[2]
Carolyn Harriott died of cancer 68 days after her husband had purchased, in their *398 joint names, a new Oldsmobile, financing nearly five thousand dollars of the debt with Central Plaza Bank & Trust Company. She did not appear at the bank, and did not sign the note. Harriott's deposition indicated that she had undergone an operation two years earlier, at which time the cancer was discovered. The carrier asserted as a defense that "At the time of securing the alleged credit life insurance policy, Robert J. Harriott and Carolyn B. Harriott knew that Carolyn B. Harriott was suffering from a serious terminal disease and fraudulently concealed and misrepresented such fact to the defendant." This defense was stricken.
We think the defense as phrased was inadequate, but that the trial court should, in the order striking the defense, have allowed a sufficiently stated defense to have been pleaded. This is the procedure outlined by the learned trial judge, sitting as associate judge of this court, in Drady v. Hillsborough County Aviation Authority.[3] In Drady, the complaint was defective, but the factual contentions disclosed by the record showed that an opportunity should be afforded the plaintiff to amplify his allegations once the legal principles were settled. Here, the defense is defective, but the record shows that the insurer ought to be given an opportunity to assert a defense under the principles herein set forth.
Credit life insurance is different from other types of insurance in several respects material to this case. Its history and growth are amply traced in the literature.[4] It has been a great boon to the expansion of consumer credit, affording a means of extending credit safely to those who enjoy steady employment but suffer the same mortality all of us do. Experience has shown that many wage earners are good credit risks, and may reasonably be loaned what they wish to borrow for the purchase of automobiles and other personal property needed in any household. Death or disability, threatening termination of the paycheck, is a serious risk, easily insured against. Credit life insurance is customarily written for declining amounts equal to the debt at time of death. It is normally written without medical examination, and without inquiry into health. In fact, the Florida Insurance Commissioner (after the transaction involved here, and neither affecting nor affected by it) issued Bulletin Number 421, stating that some companies were requiring a statement of good health or inserting in the policy allowing a defense after claim on the ground that the insured was not in "good health" or "sound health" at the time the policy was issued. These practices were forbidden. The Commissioner did state that this bulletin would "in no way interfere with the company's right to underwrite the insurance according to the normal procedures," but there is no clarification of the meaning of that proviso. We mention Bulletin 421 to show that, in general, the credit life insurer must take the borrowers as they come, and the prevalence of credit life insurance in consumer finance  estimated to be written in at least 85% of the transactions[5]  makes the business statistically safe.
But if the law is as the trial court has held in this case, the possibility is open to spouses of terminally ill persons, whose imminent death is reasonably certain, to make purchases substantial in amount which would not otherwise be made, and shift the *399 cost of these purchases on to credit life policyholders generally. On the other hand, permitting insurance companies to avoid claims on the ground of concealment of any health factor affecting the individual risk ignores the fact that credit life is written on the basis of aggregate, and not individual, risk and for sound reasons of public policy must be. What we must determine here is whether there are any circumstances under which a duty to disclose attaches to the borrower, and, if so, what these circumstances are.
Florida law affecting insurance contracts generally provides that
"Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy or contract unless either:
(a) Fraudulent; or
(b) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or
(c) The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate, or would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise."[6]
The insured in Carner Bank of Miami Beach v. Block was under no duty to disclose his previous heart trouble, because in the normal case medical history is irrelevant to the credit life risk. But the case before us may not be a normal case. There is evidence of a prior transaction at the same bank, but we know nothing of it. We do not know whether it followed the discovery of Carolyn Harriott's cancer some two years before. We do not know whether Mr. and Mrs. Harriott had routinely made her the insured in such transactions because she was the family's main breadwinner when well. There is enough in the record to suggest the possibility  we do not prejudge it  of a defense based on the deliberate purchase of an automobile and procurement of a credit life policy which any reasonable man would know would not be written if the facts were disclosed. For example, Harriott testified that he knew his wife had cancer in November 1964, at which time her physician advised him that she had 3 to 6 months to live. She never returned to her employment after that. In August 1966 she suffered a setback and underwent further surgery. Harriott says he fed her intravenously for the "last few months." There is other evidence that she gained weight in the year before she died, visited on the East Coast of Florida, celebrated the coming of the New Year in 1967  after this transaction. There are other facts to be resolved. Harriott says he advised the bank that his wife had been ill for two years, but did not say that she had cancer. Normally, credit life insurers are not interested in the particulars about an applicant's health, and this is so because of the nature of the business. But this case admits the allegation  proof is another matter  that the transaction itself was instigated as a consequence of Harriott's knowledge to a reasonable certainty that his wife's death was imminent. In this respect this case differs from the typical transaction, in which the borrower is under no obligation to reveal the details of his medical history to the loan officer.
We hold that where a purchaser acquires a valuable article and finances it in a transaction secured by credit life insurance under motivation of knowledge that the person whose life is insured, unseen by the lender, is reasonably certain soon to die, a duty to disclose the impending death of the insured arises. This case does not present the question whether the insurer may decline the risk if it knows the facts, nor need we decide what the situation *400 would have been if Carolyn Harriott had personally applied for the insurance. We leave these difficult questions to the common law process or the possible intervention of superior legislative wisdom.
For the purposes of the present case, it is apparent that the laudable purpose of credit life insurance, freely available without medical examination or inquiry, may be frustrated by the intentional acquisition of property with the knowledge, to a reasonable certainty, that the insurer must bear its cost.
Now we must distinguish this case from Carner Bank of Miami Beach v. Block. We think the Third District rightly determined that case. There the defense was "that the insured had not been eligible for the insurance because he was not able to engage in employment for wage or profit due to illness requiring further medical services".[7] That is a far cry from this case. It is to be expected that many persons who need consumer credit, and their creditors who need security, may have health problems. The social utility of a credit life system which allows for issuance of insurance without evaluation of individual risks outweighs the abstractly correct argument that premiums should reflect differences in risk. This is the value judgment which underlies group insurance generally. We perceive no threat to the system posed by a rule which would forbid the acquisition of property at the certain, or reasonably certain, expense of insurance companies, and ultimately, their policyholders. Settled law forbids insuring against a loss which the insured knows has already occurred and which he fraudulently conceals from the insurer.[8] Sound policy forbids procuring insurance against a reasonably certain loss in the immediate future without disclosing the risk.
The other point raised is without merit.
Reversed and remanded for further proceedings if defendant elects to amend to allege a defense in accordance with the principles herein discussed.
PIERCE, C.J., and McNULTY, J., concur.
NOTES
[1] Wissner v. Metro Life Ins., 395 F.2d 204 (5th Cir.1968); Massachusetts Bonding & Ins. Co. v. Hoxie, Fla. 1937, 129 Fla. 332, 176 So. 480; New York Life Ins. Co. v. Kincaid, Fla. 1935, 122 Fla. 283, 165 So. 553. See also Couch, Insurance § 38.14.
[2] Carner Bank of Miami Beach v. Block, Fla.App. 1972, 260 So.2d 282.
[3] Fla.App. 1966, 193 So.2d 201.
[4] Florida's long time Insurance Commissioner, the late J. Edwin Larson, noted a ten-fold increase in number of credit life policies between 1940 and 1955. Larson, Problems of State Regulation, 1957 Ins.L.J. 327. See also Morris, The Origin of Credit Life Insurance, 1957 Ins. L.J. 329, and other articles following; Cade, The Fundamental Issues of Consumer Credit Insurance, 1955 Ins.L.J. 76; Comment, Credit Insurance: Abuse and Reform, 10 Boston Coll.Ind. & Com.L.Rev. 439 (1969).
[5] Comment, Credit Insurance: Abuse and Reform, 10 Boston Coll.Ind. & Com.L. Rev. 439 (1969).
[6] Fla. Stat. § 627.409, F.S.A.
[7] Fla.App. 1972, 260 So.2d 282.
[8] E.g., Massachusetts Bonding & Ins. Co. v. Hoxie, Fla. 1937, 129 Fla. 332, 176 So. 480; Hunt v. Aetna Casualty and Surety Co., 153 Colo. 584, 387 P.2d 405 (1963).