44 So.3d 602 (2010)
David NOURACHI, as Trustee, etc., Appellant,
v.
FIRST AMERICAN TITLE INSURANCE COMPANY, Appellee.
No. 5D09-2554.
District Court of Appeal of Florida, Fifth District.
August 6, 2010.
Rehearing Denied September 24, 2010.
*603 Patrick A. McGee, of McGee & Perez, P.A., Orlando, for Appellant.
Bryce W. Ackerman, of Ackerman & Haines, P.A., Ocala, for Appellee.
EVANDER, J.
David Nourachi, as trustee of The HWY 44 Lakefront Trust ("Nourachi"), timely appeals from a final judgment in favor of First American Title Insurance Company ("First American") rescinding a title insurance policy. We affirm. The evidence supported the trial court's conclusion that Nourachi had knowledge of an express defect in title to the property in question at the time he sought title insurance from First American and deliberately failed to disclose this information. Where a party does not rely on a title insurance company to advise it of encumbrances prior to acquiring title to property, it may not recover on a material title defect of which it had actual knowledge and which it failed to disclose to the insurer at the time it applied for the title policy.
The underlying cause proceeded to a non-jury trial on First American's second amended complaint in which First American sought to rescind a title insurance policy it had issued to Nourachi. The facts, as found by the trial court, are set forth below:
In December 2002, for the sum of $22,600, Nourachi obtained a tax deed to certain unimproved real property located in Marion County. Nourachi then filed a quiet title action and obtained a default judgment on February 10, 2004. After the quiet title judgment was entered, Nourachi had "no trespassing" signs posted on the property. A forester with the United States Forest Service observed the signs on land that had long been part of the Ocala National Forest. On March 9, 2004, the United States Forest Service sent Nourachi a letter demanding that the signs be removed and notifying Nourachi that the land had been part of the Ocala National Forest since January 1937 when the United States purchased the tract from C.A. Savage, Jr. The following day, two of Nourachi's agents, Leo Nourachi and Sam Zalloum, met with officials of the Marion County Property Appraiser's Office. At the meeting, Nourachi's agents were advised that the county had made a mistake in adding the property to the county tax rolls and subjecting it to a tax sale because the property was actually owned by the United States. The subject property (along with other land) had been conveyed to the United States by C.A. Savage, Jr., and his wife, Dorothy Savage, on January 19, 1937, pursuant to a deed that had been recorded in Marion County's public records. *604 The County officials offered to refund Nourachi his money.[1]
Immediately after the meeting, the "no trespassing" signs were removed from the property. Approximately one week later, a copy of the 1937 deed from the Savages to the United States was faxed to Zalloum. Zalloum then contacted a land surveyor, Larry Efird, Jr., to obtain a boundary survey for the property. Efird was provided with both a copy of the 1937 deed and the tax sale deed. At Zalloum's request, Efird sketched out the property described in the 1937 deed and his drawing reflected that at least a part of the property described in the 1937 deed fell within the property described in the tax deed. Efird quoted Zalloum a $3,000 fee to complete an actual survey. However, Nourachi did not retain Efird to perform an actual survey until December 2008  well after the commencement of the instant lawsuit.
In August 2004, Nourachi contacted First American, represented himself as the owner of the subject property, and requested First American issue a title insurance policy in the amount of $550,000. Nourachi deliberately failed to disclose the existence of the United States' claim to the property and First American negligently failed to discover same. As a result, First American issued a title policy to Nourachi in the requested amount. Approximately one year later, at Nourachi's request, the amount was increased to 1.3 million dollars. First American would not have issued the title policy if it had known of the United States' claim.
In June 2006, after Marion County refused to accept Nourachi's tax payment, Nourachi notified First American that the United States claimed ownership of the property. On October 5, 2006, First American filed a one count complaint against Nourachi seeking a declaration of its rights under the policy. In January 2007, First American filed an amended complaint, again asserting a single count for declaratory judgment. On July 9, 2008, First American filed a motion to amend its complaint to add a count for rescission. The motion was granted[2] and trial was held on June 10, 2009.
In entering judgment in favor of First American, the trial court found that Nourachi should not benefit by deliberately concealing a known, express defect in the title and then argue that the insurer should have been more circumspect or astute in performing its title search duties. The trial court granted First American's claim for rescission and directed First American to refund any title insurance premiums paid within thirty days.
On appeal, Nourachi argues that he had no duty to disclose facts that First American could, by its own diligence, have discovered in this arms-length transaction. Nourachi contends that a title company should not avoid liability when a defective condition of title, not excepted from coverage, subsequently causes a loss to the insured even though the insured knew of the particular defect. We reject Nourachi's argument and conclude that where an insured purchases property, subsequently learns of facts establishing that he does not have good title to the property, and then seeks title insurance without disclosing this known, express defect in title to *605 the insurer, he is not entitled to recover under the policy.
In reaching our conclusion, it is important to recognize the general nature and purpose of title insurance. Usually, a prospective purchaser of title insurance avails himself of a title insurance company's services prior to acquiring title to property for which he is seeking to have title insured. The prospective purchaser will typically lack knowledge of encumbrances which may cloud the title and, accordingly, will employ the services of the title insurance company so that he can learn whether encumbrances exist and to obtain insurance against those claims against title that may arise after issuance of the policy. The title company is to perform a title search and advise the prospective purchaser of any encumbrances upon the land that are revealed by the search. Thus, the prospective purchaser will typically rely on the title insurance company's expertise in searching the records and its willingness to issue a title policy in making a final decision as to whether to purchase a particular piece of real estate. Commonwealth Land Title Ins. Co. v. Ozark Global, L.C., 956 F.Supp. 989 (S.D.Ala.), aff'd, 127 F.3d 41 (11th Cir.1997).
In recognition of a prospective purchaser's presumed reliance on a title company's search, the general rule is that where a title company issues a policy in conjunction with the insured's purchase of property, the title company is obligated to answer for any defect that is a matter of public record which is not excepted by the policy. See Parker v. Ward, 614 So.2d 975, 977 (Ala.1992); Lawyers Title Ins. Corp. v. D.S.C. of Newark Enters., Inc., 544 So.2d 1070, 1072 (Fla. 4th DCA 1989). This rule has been found to apply even where the insured is alleged to have had actual knowledge of a material defect in title at the time of closing. L. Smirlock Realty Corp. v. Title Guarantee Co., 52 N.Y.2d 179, 437 N.Y.S.2d 57, 418 N.E.2d 650, 654 (1981).
However, where an insured does not apply for or receive a title insurance policy (or otherwise request a title search) from an insurer until after he has acquired title to the property, the insured's failure to disclose a material defect in title of which the insured had actual knowledge will preclude coverage. Ozark Global; Pioneer Nat'l Title Ins. Co. v. Lucas, 155 N.J.Super. 332, 382 A.2d 933 (N.J.Super.Ct.App.Div.), aff'd, 78 N.J. 320, 394 A.2d 360 (1978).
In Ozark Global, Fletcher Oil Company executed and delivered a warranty deed to Ozark Global L.C. ("Global") conveying certain real property in Mobile County, Alabama. The deed was expressly made subject to six state of Alabama revenue tax liens against Fletcher Oil Company, which secured an indebtedness in excess of $50,000. Global subsequently applied for a title insurance policy from Commonwealth. Commonwealth issued a title policy, which, through inadvertence or oversight, failed to list as exceptions those State of Alabama Department of Revenue tax liens that had been set forth in the deed but had not been released. The parties stipulated that Global knew or should have known at all applicable times that such liens had not been released. Global further acknowledged that it had not relied to its detriment on Commonwealth's failure to except those tax liens from the policy. Nevertheless, Global contended that Commonwealth was responsible for the liens based on the language of the policy.
In resolving the case in favor of Commonwealth, the court emphasized that Global did not rely on Commonwealth to advise it of encumbrances on the property, stating:

*606 Global's non-reliance upon Commonwealth for advisement as to whether the purchased land was encumbered is of utmost importance, for this fact displaces the general rule that a title insurer is liable for all title defects not specifically listed as exceptions to coverage.
Id. at 992.
The court observed that the purpose of title insurance is to protect a purchaser of real estate against title "surprises." When an insured has already purchased the property and is aware of title defects prior to applying for a title policy "it cannot be said that the insured will experience `surprise' when the title insurance policy does not list the known encumbrance as an exception to coverage." Id.; see also D.S.C. of Newark Enters., Inc., 544 So.2d at 1072-73 ("Also, since there is an element of reliance involved in the analysis of whether the title insurer should be held liable it is more difficult for an insured to recover where title is first taken and then title insurance is procured.")
The dissent attempts to distinguish Commonwealth by arguing that the title defects in question were the subject of an exclusion provision in the policy. In fact, the primary basis of the court's decision was as described above. The court only addressed the exclusion provision of the policy toward the end of its opinion as an alternative ground for its decision. "Alternatively, the court holds that the six tax liens fell within the `created, suffered, assumed or agreed to by the insured claimant exclusions in the title policy. ...'" 956 F.Supp. at 993 (emphasis added). The dissent's attempt to distinguish Ozark Global is actually a request to ignore what the Ozark Global court itself deemed to be the primary holding of the case.
In Lucas, the public records reflected that Lucas owned certain property on which she had been paying taxes for several years. She then learned that approximately thirteen acres of her property was apparently owned by a neighbor. The title defect occurred because sometime in the 19th Century, the insured's predecessors in title twice conveyed the subject property. In the second conveyance (to Lucas' predecessor), they were attempting to pass title to land they did not own. Armed with this information, the insured contacted Pioneer Title and requested a sixty-year title search. Not surprisingly, the sixty-year title search performed by Pioneer did not uncover the defect in Lucas' title. After receiving the sixty-year title search, Lucas then obtained a title insurance policy from Pioneer. When the neighbor subsequently brought a quiet title action against Lucas, Pioneer sought to rescind the title policy. The trial court denied Pioneer's claim, finding that no fraud had been committed by the insured. The appellate court reversed, finding that the record established "beyond question" that the policy was procured by half-truths and concealment. The court found that the insured had deliberately failed to disclose to Pioneer known matters relating to the title, material to the risk insured against, and as part of the design to mislead the insurer into issuing a substantial policy. The appellate court further observed that the insured had lulled Pioneer into a false sense of security by suggesting that a sixty-year search would be sufficient. Like Nourachi, Lucas argued that she was under no duty to disclose to the insurer those defects that appear in the public records. The court concluded that one who engaged in the above-described conduct may not urge that her victim should have been more circumspect or astute. 382 A.2d at 342.
The dissent attempts to distinguish Lucas by categorizing it as a "garden variety *607 fraud case" because Lucas' agent went beyond simple non-disclosure by initially only requesting a sixty-year title search and suggesting that a sixty-year title search should be sufficient. The dissent ignores the distinction between a request for a title search and a title policy. Lucas requested and Pioneer provided a sixty-year title search. Based on Lucas' request, Pioneer was not required to do more at that time. However, when Lucas subsequently applied for a title policy, Pioneer was obligated to search further and was negligent if it failed to do so. Notwithstanding that negligence, the court determined that Lucas' claim must fail because of her intentional failure to disclose the known material defect in title. The dissent's argument is also internally inconsistent. On the one hand, the dissent calls Lucas a "garden variety fraud case." On the other hand, it contends that fraud cannot be found where the insured makes representations that are refuted by recorded documents in the chain of title  the type of representations made by Lucas' agent.
The Lucas decision was based primarily on the insured's intentional failure to disclose a material defect in title at the time she sought to obtain a policy on property she had already acquired. Lucas' agent's aforedescribed actions were evidence that Lucas had actual knowledge of the defect and refused to disclose same in the hope that the title search performed by Pioneer in conjunction with the request for the title policy would be deficient.
Our decision is also consistent with the general principle that a party may not insure against a loss that he knows has already occurred and that he fails to disclose to the insurer. Mass. Bonding & Ins. Co. v. Hoxie, 129 Fla. 332, 176 So. 480, 482 (1937); see also Nat'l Life Ins. Co. v. Harriott, 268 So.2d 397, 400 (Fla. 2d DCA 1972). In Hoxie, the insured had permitted two premises liability insurance policies to expire. Approximately two months later, an individual was injured on the premises by a falling light fixture. Immediately after learning of the occurrence of this incident, the insured paid a new premium and had the policies reinstated effective back to the initial expiration date. The insured failed to advise the insurance company of the above-described incident. Our supreme court determined that the insurer was entitled to a cancellation of the policy because the insured's non-disclosure constituted a fraudulent concealment of a material fact which was equivalent to a false representation that the fact did not exist. The court cited with approval to the following language from Joyce on Insurance (1st Ed.) Vol. 1 page 159, section 99:
If the delivery [of an insurance policy] be obtained by misrepresentation or fraud, it can have no effect as a binding contract, as in case the assured has knowledge of the loss at the time the application is made and conceals the fact.
Hoxie, 176 So. at 482.
The dissent attempts to limit Hoxie's holding to situations where the insured had "superior knowledge not available to the other party." However, there is no such limitation expressed in Hoxie. Indeed, the insurer in Hoxie could have placed itself in an equal position of knowledge with regard to the claim in question by simply "asking the right questions" in its application form. Alternatively, the insurer could have neutralized the superior knowledge position of the insured by inserting an appropriate exclusion provision in the policy. Our supreme court did not require the insured to do either  thereby reflecting that its decision was not based on the comparable positions of knowledge of the insurer and the insured.
*608 Our sister court in Harriott properly concluded that the Hoxie decision was based on the general principle that an insured cannot seek to insure against a loss known by the insured but not disclosed to the insurer. Citing to Hoxie, the court stated:
Settled law forbids insuring against a loss which the insured knows has already occurred and which he fraudulently conceals from the insurer. Sound policy forbids procuring insurance against a reasonably certain loss in the immediate future without disclosing the risk.
Harriott, 268 So.2d at 400 (footnote omitted).
Here, the facts amply support the trial court's determination that Nourachi had knowledge of an express defect in title at the time he sought a policy from First American. Indeed, the very entity that sold the property to Nourachi specifically advised him that it (Marion County) did not have good title at the time of the conveyance. Immediately thereafter, Nourachi was provided a copy of the 1937 Savage deed to the United States confirming Nourachi's lack of good title. Nourachi then delayed the actual employment of a surveyor after being advised by the surveyor that at least part of the property he had obtained by tax deed was encompassed within the legal description set forth in the 1937 deed.
Furthermore, the United States' claim against Nourachi's property interest had fully matured by the time Nourachi had applied for a title policy. The United States had notified Nourachi in writing that it had a superior claim to the subject property pursuant to the 1937 deed that had been recorded in Marion County's Public Records. The United States had further made written demand upon Nourachi to remove personal property (the "No Trespassing" signs) that he had placed on the disputed parcel. Thus, we face the issue of whether a party having actual knowledge of a specific claim against his existing property interest has a duty to disclose that information where the claim has matured to the extent that the insurer's duty to defend against that specific claim would come into existence the instant the policy was issued. We believe, and Hoxie strongly suggests, that the answer is "yes." Ozark Global and Lucas reached the same conclusion. Notably, the dissent has failed to cite to a single case that answered this question in the negative.[3]
The dissent also suggests that the title policy in question expressly provides coverage for defects of which the insured had actual knowledge and which could be discovered in the public records. It does not. The policy simply excludes from coverage title defects of which the insured had actual knowledge and which are not recorded in the public records. As explained supra, the insured's obligation to disclose title defects of which the insured had actual knowledge and which are recorded in the public records is dependent on when the title policy was procured and whether the insured presumptively relied on the insurer's title search. See Ozark *609 Global, 956 F.Supp. 989; D.S.C. of Newark Enters., Inc, 544 So.2d 1070.
Regardless, the dissent's suggestion that this case be determined solely on contract language was effectively rejected by our supreme court in Hoxie. In Hoxie, the literal language of the policy would apparently have provided coverage. Alternatively, the supreme court could have determined that to preclude liability, the insurer in Hoxie should have inserted an appropriate exclusion provision in the policy. Instead, the supreme court imposed a duty to disclose on the insured. The imposition of this duty was recognition that an insurance policy is designed to protect an insured against a potential risk  not to provide compensation for a claim that has already been made against the insured at the time the policy is sought.
The dissent also argues that Hoxie is distinguishable because it involves an indemnity policy rather than a title policy. There are valid policy reasons to treat the two policies differently when an insured procures a title policy in conjunction with the acquisition of an interest in property. In that situation, it is appropriate to presume that the insured has relied upon the title company's expertise in searching the public records. Additionally, prior to closing, the insured will ordinarily not have a property interest against which a third party may make a claim. Where there is no reliance by the insured on the insurer's search and a claim has already been made against the insured's property interest, there is no valid reason to depart from the general principle articulated in Hoxie and Harriott.
This is not a case of a party seeking to insure against the risk of a potential adverse claim. In fact, under Nourachi's legal theory, he had a valid claim against First American the instant it issued its policy. Nor is this a situation in which a party relied on a title company to properly perform a title search. Rather, the evidence suggests that Nourachi hoped that First American's title search would be deficient so as to afford him the opportunity to seek a recovery on a title policy.
To accept Nourachi's argument would promote unsavory gamesmanship. For example, a party having actual knowledge of its defective title (but refusing to disclose same) could seek title insurance from one insurer after another until eventually finding an insurer that negligently failed to discover the title defect, and then make a claim on that insurer's subsequently-issued policy. The law should not encourage this type of conduct.
AFFIRMED.
LAWSON, J., concurs specially with opinion.
TORPY, J., dissents with opinion.
LAWSON, J., concurring.
I concur in the majority opinion, but write to address what I view as the fundamental analytical flaw in an otherwise well-reasoned dissenting opinion. The dissent very logically and persuasively sets forth basic contract law and tort principles that, if applied to this case, would lead to a different result. This analysis, however, fails to recognize that there are some common law principles related to insurance (sometimes called "insurance law") that uniquely apply in the insurance context. This case is nothing more than a straight-forward application of one of the most basic insurance law principles  most often referred to as the "fortuity" principle or "known loss doctrine."
As explained in Appleman's latest insurance treatise:
One of the fundamental assumptions deeply embedded in insurance law is the *610 principle that an insurer will not pay for a loss unless the loss is "fortuitous," meaning that the loss must be accidental in some sense. The public policy underlying the fortuity requirement is so strong that if the insurance policy itself does not expressly require that the loss be accidental courts will imply such a requirement. The fortuity principle is often expressed with reference to certainty: losses that are certain to occur, or which have already occurred, are not fortuitous.
Robert H. Jerry, II, Insurance Law's Fundamental Concepts and Assumptions, in New Appleman on Insurance Law Library Edition § 1.05 (2010). "[T]he fortuity and known loss doctrines are `integral to the nature of insurance and thus apply as a matter of public policy, irrespective of specific policy terms.'" HSB Group, Inc. v. SVB Underwriting, Ltd., 664 F.Supp.2d 158, 183 (D.Conn.2009) (quoting Nat'l Union Fire Ins. Co. v. Stroh Companies, Inc., 265 F.3d 97, 107 (2d Cir.2001)); see also General Housewares Corp. v. Nat'l Surety Corp., 741 N.E.2d 408, (Ind.App.2000) ("the known loss doctrine is not so much an exception, limitation, or exclusion as it is a principle intrinsic to the very concept of insurance").
"Essentially, the doctrine provides that one may not obtain insurance for a loss that either has already taken place or is in progress." Pittston Co. Ultramar America Ltd. v. Allianz Ins. Co., 124 F.3d 508, 516 (3d Cir.1997); see also Rohm & Haas Co. v. Cont'l Cas. Co., 566 Pa. 464, 781 A.2d 1172, 1177 (2001) ("[W]hen an insured knows of an insurable harm incurred prior to the purchase of an insurance policy, the insured has suffered a `known loss' and the damage is no longer a mere risk and is deemed uninsurable."); 7 Lee R. Russ and Thomas F. Segalla, Couch on Insurance, § 102:8 at 20 (3d ed. 1997) ("losses which exist at the time of the insuring agreement, or which are so probable or imminent that there is insufficient `risk' being transferred between the insured and insurer, are not proper subjects of insurance").
This basic doctrine does not arise from a desire to protect an individual insurance company from something akin to fraud, as the dissent seems to suggest, but from a recognition that "the insured's risk is, in a real sense, borne by the insurer's policyholders as a group, from whose pool of premiums all claims must be paid if the insurer is to remain in business." Fairfield Ins. Co. v. Stephens Martin Paving, LP., 246 S.W.3d 653, 673-74 (Tex.2008). In other words, because society as a whole relies on insurance, public policy will not permit a transaction that is anathema to the very concept of insurance which, if allowed in the aggregate, could put insurance at risk for all.
In this case, the finder of fact expressly found that David Nourachi committed "fraud" by not disclosing the "known, express defect in title" created by the United States' superior ownership interest in the land. Although I agree with the dissent that the facts should not have been viewed through the lens of Florida tort law (fraud being an intentional tort), still, the trial court's finding can only be understood as a finding that Nourachi knew that he had suffered a loss compensable under the title policy before he purchased the First American policy. Because "one may not obtain insurance for a loss ... that the insured either knows of, planned, intended, or is aware is substantially certain to occur" prior to contracting for insurance, 43 Am. Jur. 2d Insurance, § 479, the policy was properly rescinded.
The dissent is correct in its observation that, analytically, the fortuity doctrine would support a broader rule in the title insurance context than the rule applied in *611 the majority opinion (and the cases relied upon therein). However, unlike the dissent, I see no reason to reject the more narrow rule simply because a broader rule might also be justified.
TORPY, J., dissenting.
The analysis of this case should begin and end with the insurance contract, which not only insures that title is vested in Appellant, but also provides coverage for undisclosed claims of the type at issue here. Although the policy contains an exclusion for known and undisclosed claims, it expressly excepts from that exclusion claims that may be discerned from the public record. See J.S.U.B., Inc. v. U.S. Fire Ins. Co., 906 So.2d 303, 309 (Fla. 2d DCA 2005) (exception to exclusion considered in determining scope of coverage). Specifically, the policy excludes coverage for:
Defects, liens, encumbrances, adverse claims, or other matters ... not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to [the effective date of the policy].
The majority opinion dismisses this contract language by concluding that it only applies in the event that title insurance is procured before the property is purchased, a limitation not mentioned at all in the policy. With a stroke of the court's pen, the majority rewrites the contract to incorporate this limitation. The majority relies in part on fraud cases to support its holding, yet it conspicuously avoids any analysis of the elements of the law of fraud, the proof of which is woefully lacking here. Apparently conceding the absence of fraud, which was the basis upon which the lower court granted relief, the majority announces a customized, unlabeled legal theory that it purports to exact from two readily distinguishable decisions of foreign jurisdictions. Because established legal doctrine does not support Appellee's right to rescind the insurance contract, I dissent.
What the trial judge stated as his "critical factual finding" was that Appellant "was specifically placed on notice that the United States of America was claiming a superior interest in the real property," but failed to disclose it to Appellee. The actual ownership of the parcel was far from settled at the time Appellant purchased the insurance and even by the time of trial. The legal descriptions in the competing deeds were difficult to compare, so much so that both the property appraiser and title insurer had (apparently) incorrectly determined the ownership of the parcel. The surveyor could not figure it out without a full-blown survey costing several thousand dollars. His off-the-cuff opinion, which the trial judge did not include in his detailed findings of fact, even if properly considered by our Court, only implicated "part" of the property. Appellant had a deed to the property and had completed a quiet title action. The trial judge made no finding that Appellant's claim of title was not colorable, nor was there evidence from which such a finding could be made. Appellant's deed had not been cancelled.
Unlike the majority, I do not think what Appellant did was unusual or unsavory. Appellant had purchased the property without the benefit of a warranty deed, which is typically the case in a tax deed sale. He filed and concluded a quiet title action  again, typical. Once he became aware of the claim of the United States, he consulted with a surveyor who could not give him a definitive answer without a full-blown survey. Instead of paying a surveyor $3,000, to investigate the claim on a piece of land that cost Appellant only *612 $22,000, he took the prudent step of seeking a title policy at no initial cost. Cost aside, the procurement of title insurance afforded a more definitive and secure resolution of any doubt about ownership. The fact that Appellant sought a policy in excess of the purchase price was not unusual at all. The policy amount sets the ceiling on damages; it is not the measure of damages. This was vacant land. No doubt, Appellant desired to develop the property and sought to protect his future investment. Property owners not only rely upon title insurance in the acquisition of property, but also in connection with the exploitation of property already acquired, especially when the acquisition is without a warranty deed.
The trial judge permitted the rescission of the insurance contract based upon a finding that Appellant had procured the insurance through fraud.[4] Because Appellant made no affirmative misrepresentation of fact, the lower court based its finding of fraud on the failure to disclose that which Appellant had a duty to disclose. The majority affirms the rescission without any analysis of the elements of the law of fraud. This is a critical omission because a party may not avoid the effect of a contract by claiming fraud in the inducement when the subject of the representation is expressly addressed in the contract. Mac-Gray Servs., Inc. v. DeGeorge, 913 So.2d 630, 634 (Fla. 4th DCA 2005). This is a point missed by the majority, which cites Massachusetts Bonding & Insurance Co. v. Hoxie, 129 Fla. 332, 176 So. 480 (1937), for the general proposition that "literal language" may be avoided when a contract is procured by fraud. When a contract specifically addresses the very issue that is the subject of the alleged misrepresentation, this general proposition does not apply. Id. Here, this contract actually addresses the issue of nondisclosure by the insured of known claims and expressly excepts any duty of disclosure when the claims are matters in the public record. The duty of disclosure is thus negated by the contract itself, and the insurer assumes the risk of all claims of this sort, whether known or not known, or disclosed or not disclosed.
Even if the contract itself did not negate any duty of disclosure on Appellant's part, the general rule is that there is no duty to disclose facts during the formation of a contract. Maxwell v. First United Bank, 782 So.2d 931, 934 (Fla. 4th DCA 2001). Under Florida law, there are four categories of exceptions to the general rule. First, when the parties are in a fiduciary relationship. Dale v. Jennings, 90 Fla. 234, 107 So. 175 (1925). Second, where a party not under a duty to disclose undertakes to do so, but does so with half-truths. Vokes v. Arthur Murray, Inc., 212 So.2d 906 (Fla. 2d DCA 1968). Third, when a statute imposes the duty. See, e.g., § 517.061(11)(a)3., Fla. Stat. (2008) (dealing with sale of securities). Fourth, where one party has superior knowledge unavailable to the other, but then only under limited circumstances. See, e.g., Johnson v. Davis, 480 So.2d 625 (Fla.1985) (sale of residence containing known, latent, material defects). These exceptions do not apply here.
In the specific context of title insurance, the rule is that "an insured under a policy of title insurance ... is under no duty to disclose to the insurer a fact which is readily ascertainable by reference to the public records. Thus, even an intentional failure to disclose a matter of public record *613 will not result in a loss of title insurance protection." L. Smirlock Realty Corp. v. Title Guarantee Co., 52 N.Y.2d 179, 437 N.Y.S.2d 57, 418 N.E.2d 650, 654 (1981); see also Lawyers Title Ins. Corp. v. D.S.C. of Newark Enters., Inc., 544 So.2d 1070, 1072 (Fla. 4th DCA 1989) (general rule is that title insurer cannot avoid liability for condition discernable from public record, even if insured knew of defect and failed to disclose it to insurer). Indeed, this policy expressly incorporates this rule. The majority opinion acknowledges this "general rule."
Although the cases upon which the majority relies all fit within one of the four exceptions to the general rule, this case does not fit within any of these exceptions. Instead of denying relief, the majority creates today a fifth exception to the general rule of nondisclosure  where an applicant for insurance becomes aware of a claim after he buys the property, but before he procures the insurance. Setting aside the fact that this policy expressly negates that duty for recorded claims, this holding is without doctrinal support in the law of contracts.
The majority fails to label the legal theory upon which it relies and offers flawed logic for the rule, which appears to apply only in the context of title insurance. It reasons that the owner relies upon the insurer's expertise only before it purchases the property, but not after, and that the general rule of nondisclosure should not apply when reliance is lacking. The fallacy in this distinction is that the insured has knowledge of the defect in both scenarios, so reliance from the standpoint of the insured is the same in both situations. Under the majority's approach, an insured who knows of a defect in title, but purchases property in the face of this knowledge, thereby intentionally damaging himself, is protected, whereas an insured who purchases property without knowledge of a defect, but who learns of the defect before procuring the insurance, is not. I fail to see how this factual distinction should make a difference in the rule of law. In both circumstances, the conduct of the insured is similarly "unsavory," using the majority's characterization of the conduct. The misdirection of the majority's rationale lies, in part, with its purported reliance on two decisions from foreign jurisdictions. When the holdings of these decisions are confined to the facts in each case, they do not support the holding here. Only by seizing on the superfluous language in these decisions does the majority find any precedential support for its rule of law. To this extent, however, these decisions do not embody the law of Florida. In any event, they are both readily distinguishable on the facts.
In Commonwealth Land Title Insurance Co. v. Ozark Global, L.C., 956 F.Supp. 989 (S.D.Ala.1997), the contract contained an express exclusion that precluded coverage. There, the insured purchased property that was encumbered by six state tax liens. The warranty deed under which the insured took title was expressly made subject to the liens. The insured procured a title policy without disclosing the liens and the title company did not expressly delineate the liens in the exclusions. The policy did, however, exclude defects that had been "created, suffered, assumed or agreed to by the insured claimant." Id. at 993 (emphasis supplied). The court concluded that the tax liens fell within this exclusion because the insured had taken title with an express assumption of the liability. Id. Here, Appellant never expressly assumed or even acknowledged the validity of the defect. The policy here contains the same exclusion, but Appellee has made no contention that Appellant ever "assumed" the defect. Thus, Ozark Global presents a dramatically *614 distinct scenario where the insured sought to insure against an obligation that it had expressly assumed and the contract expressly excluded from coverage.
Pioneer National Title Insurance Co. v. Lucas, 155 N.J.Super. 332, 382 A.2d 933 (N.J.Super.Ct.App.Div.), aff'd, 78 N.J. 320, 394 A.2d 360 (1978), the second case on which the majority relies, is nothing more than a garden variety fraud case. In that case, the insured had been informed by his attorney that his title was defective. The attorney told the insured that an exhaustive investigation had been conducted and the outcome certain. The insured engaged a second attorney who acted as his agent in procuring title insurance. Even though the second attorney was fully aware of the defect and that it could only be detected if the title company searched beyond the customary sixty-year period, he, in a letter, requested a sixty-year search and only agreed to pay for the sixty-year search. The attorney also directed the insurer's attention to a particular concern for the purpose of diverting its attention from the real concern. The court concluded that "[t]he record establishe[d] beyond question that [the] policy was procured by half-truths and concealment by [the insured's attorney] that justify its rescission." Id. at 937. It found that the attorney had taken "advantage of [the insurer's] credulity by leading it to believe that the usual 60-year search would suffice, when he knew that an adverse claim was being made by reason of conveyances well beyond that period in the 19th Century." Id. In drawing a distinction from the general rule, the Lucas court stated:
However, here more than awareness of a title defect is involved. The insured's attorney actually knew of an adverse claim discoverable only by a search beyond the usual 60 years; yet by deliberate silence, he induced the title company to rely on a 60 year search. Moreover, in the letter to [the insurer] confirming the request for a title search, [the insured's attorney] stated that the problem he wanted examined consisted of a disparity between the description of the property in the deed and the tax map. This reflects an attempt to lull [the insurer] into believing that the difficulty, if any, was something quite different from the real problem.
Id. at 938 (emphasis supplied).
Lucas illustrates an exception to the general rule  that a party who undertakes to disclose information, even when not under a duty to do so, must disclose all material information. The very use of this exception presupposes that there exists no duty to disclose unless and until there is a partial disclosure. Here, by contrast, Appellant made no attempt to lull Appellee into a negligent search.
Neither do the Florida cases cited by the majority support its conclusion. Hoxie, 129 Fla. 332, 176 So. 480, is clearly distinguishable. It involved the exception to the general rule that applies when a party has superior knowledge not available to the other party. There, the insured was seeking retroactive renewal of an indemnity policy, but did not disclose that someone had fallen on the property during the lapse in coverage. Here, by contrast, it was Appellee, the insurer, that had superior access to the information. It was specially trained to find the information, and legally obligated to find it. Hoxie also involved indemnity insurance, an entirely different creature than title insurance. This is a distinction overlooked by my concurring colleague whose reliance on the "fortuity" doctrine is misplaced.[5] Indemnity insurance *615 protects against the risk of a subsequent occurrence. The premium is based on an actuarial prediction. Title insurance, by contrast, is issued based upon past events and represents the "informed opinion of title examining experts employed by the company that title is in the condition expressed in the policy." D.S.C. of Newark Enters., 544 So.2d at 1072. Title insurers routinely issue policies in the face of ambiguous documents and known claims. They are in the peculiar position to assess their risk with reasonable certainty and disclaim that which they are unwilling to assume. Here, Appellee expressly assumed the risk of claims that were discernable from the public record, even those known by Appellant. Again, New York's highest court makes this very point:
[T]itle insurance is procured in order to protect against the risk that the property purchased may have some defect in title. The emphasis in securing these policies is on the expertise of the title company to search the public records and discover possible defects in title. Thus, unlike other types of insurance, the insured under a title policy provides little, if any, information to the title company other than the lot and block of the premises and the name of the prospective grantor. Armed with this information, the title company then can search the various indices and maps to ascertain the state of title to the property. Indeed, it is because title insurance companies combine their search and disclosure expertise with insurance protection that an implied duty arises out of the title insurance agreement that the insurer has conducted a reasonably diligent search.
L. Smirlock Realty Corp., 437 N.Y.S.2d 57, 418 N.E.2d at 654-55.
National Life Insurance Co. v. Harriott, 268 So.2d 397, 400 (Fla. 2d DCA 1972), also involved the nondisclosure of a fact known only by the insured (in the procurement of a credit life insurance policy) and unavailable to the company. Central to the court's decision was the nature of the credit life insurance itself, which is issued without an application, health examination or investigation. Thus, as with the other *616 cases the majority relies on, Harriott is similarly distinguishable.
Even if a duty to disclose exists, the second part of the trial court's conclusion  that Appellant fraudulently concealed his knowledge  is an erroneous application of the law of fraud. Again, the majority opinion is devoid of any analysis of the elements of fraud. A central premise in the analysis of a fraud claim based upon nondisclosure is that the party advancing the claim must prove the claim as if the culpable party had "represented the nonexistence of the matter he failed to disclose." Restatement (Second) of Torts § 551; see Humana, Inc. v. Castillo, 728 So.2d 261, 265 (Fla. 2d DCA 1999) (reliance is element of fraud based on nondisclosure). In other words, the proof of fraud based upon nondisclosure requires proof of all the elements of common law fraud, except that the nondisclosure may serve as a substitute for the "affirmative misrepresentation" element. Otherwise, proof of fraud of the nondisclosure variety would be easier than if the culpable party had affirmatively misled the aggrieved party by denying the existence of the nondisclosed fact, a considerably more reprehensible variety of fraud. Thus, whether based upon an affirmative misrepresentation or a nondisclosure, the proponent of a fraud claim must establish materiality, the intent to induce reliance and justifiable reliance. Proof of any of these elements is woefully lacking here, something the majority totally overlooks.[6]
First, the nondisclosure was not material. The immateriality of the nondisclosed facts is conclusively proven here by the policy itself. The policy expressly addresses claims that are unknown by Appellee and known by Appellant, but only excludes from coverage those claims that are not discernible from the public record. By excepting from the exclusion those claims that are recorded in the public records, Appellee affirmatively eliminated any duty to disclose these facts because it expressly undertook the responsibility to find them and expressly accepted liability in the event that it did not find them. Even without this policy language, a reasonable title insurance company would attach no significance to an insured's representation of ownership or that his title to the property is free from claims of record. Title insurance companies are in the business of discerning ownership by resort to their own research and peculiar expertise. "Examination of record title or an abstract of the record title of real property is both an esoteric and a painstaking process[,]" which requires "considerable expertise." D.S.C. of Newark Enters., 544 So.2d at 1072.
Second, there was no intent to induce reliance by the nondisclosure. Again, the policy itself expressly addresses itself to claims that are unknown by Appellee and known by Appellant, but only excludes from coverage those claims that are not discernible from the public record. There can be no intent to induce reliance by failure to disclose that which is expressly addressed by the contract. Even absent this policy language, Appellant had every reason to expect that Appellee, the title insurer, would get to the bottom of who had title to this property using its own expertise. As New York's highest court explained:

*617 [B]ecause record information of a title defect is available to the title insurer and because the title insurer is presumed to have made itself aware of such information, we hold that an insured under a policy of title insurance such as is involved herein is under no duty to disclose to the insurer a fact which is readily ascertainable by reference to the public records.
L. Smirlock Realty Corp., 437 N.Y.S.2d 57, 418 N.E.2d at 654.
Finally, Appellee cannot establish justifiable reliance under an objective standard. In M/I Schottenstein Homes, Inc. v. Azam, 813 So.2d 91 (Fla.2002), our high court considered whether the purchaser of property can justifiably rely on misrepresentations that are refuted by recorded documents in the chain of title. It concluded that it could not:
[W]here recorded information which is clearly contained in the chain of title of the parcel purchased is asserted as the basis for an action for misrepresentation by the purchaser, a distinct and very different matter than the situation discussed herein exists. Knowledge of clearly revealed information from recorded documents contained in the records constituting a parcel's chain of title is properly imputed to a purchasing party, based upon the fact that an examination of these documents prior to a transfer of the real property is entirely expected. For this reason, it may often be the case that where fraud regarding information contained in and clearly revealed through a parcel's chain of title is alleged, reliance is not justified and a cause of action will not exist. It is also plain that there may be situations in which a party's allegations of fraudulent misrepresentation fail to state a cause of action. Where the pleadings of the parties make it evident that reliance on the part of a purchaser was not justified as a matter of law, a trial court may certainly be correct in ruling as a matter of law that no cause of action exists.
Id. at 95. (citations omitted). Where the allegedly defrauded party is sophisticated, the lack of justifiable reliance is especially compelling. See Wasser v. Sasoni, 652 So.2d 411, 413 (Fla. 3d DCA 1995) (sophisticated party not justified in relying on fact available to party through reasonable diligence); see also Nicholson v. Ariko, 539 So.2d 1141, 1142 (Fla. 5th DCA 1989) (party may not reasonably rely upon interpretation of legal document to support claim for fraud). If this type of information is imputed to a lay purchaser, it must certainly be imputed to a title insurer trained and duty-bound to find it. See D.S.C. of Newark Enters., 544 So.2d at 1072 (title insurer has legal duty to make "thorough and competent search"). A title insurer is more sophisticated at discerning claims of this nature than anyone, including most lawyers. To suggest that it can reasonably rely upon anything that a layperson discloses about ownership turns the law of fraud on its head. See Giallo v. New Piper Aircraft, Inc., 855 So.2d 1273, 1275 (Fla. 4th DCA 2003) (party cannot recover in fraud for alleged oral misrepresentations that are adequately covered or expressly contradicted in contract).
The majority justifies its holding using the policy argument that the creation of this duty is necessary to avoid "unsavory" conduct in the future. Whether Appellant's conduct was unsavory begs the question. To create a duty to avoid unsavory conduct that is not unsavory but for the duty is the product of dyslexic logic. If there was no duty to speak, then there was nothing wrong with what Appellant did here. Certainly, his conduct defies no natural law. Indeed, before today, in an arm's-length transaction, there was no duty to disclose matters about which the other party has equal, if not superior, access. *618 This is like the client who shops from lawyer to lawyer until he finds one who gives him the opinion that his proposed course of conduct comports with the law. As long as he does not misrepresent the facts, the client has no duty to tell the negligent lawyer that prior opinions have differed from his. The fact that the client had been given correct opinions by prior lawyers does not excuse the last lawyer from his duty to use due care.
In my view, established public policy, embodied in Florida jurisprudence, actually supports a contrary conclusion. Public policy favors freedom of contract, especially when the party seeking to avoid the contract is sophisticated and fully capable of protecting itself. See Nicholson, 539 So.2d at 1142 (rejecting, as matter of law, sophisticated businessman's attempt to avoid contract based on fraud). Here, it was Appellee that drafted the contract. All it had to do to avoid this dilemma was to exclude coverage for all defects known by the insured but not disclosed, whether or not the subject of public record. Instead it only excluded that which it could not be expected to find. I see no justification for excusing the performance of the bargained-for contract. There is also the policy that imposes upon title insurers the obligation to make a diligent search of the public record. Had Appellee fulfilled its obligation, it would have discovered the claim. Again, I see no reason why we should shift this duty to Appellant just because he had been given a different opinion that he did not disclose.
I am also concerned that the rule of law announced today is vague and capable of unforeseen havoc. If the holding is as expressed, under what circumstances does knowledge of a claim trigger the duty to disclose that which is discernable from a diligent search of the public record? Does it depend on the quality of the claim? Does it depend upon the identity of the claimant? Does the duty come into play only when a governmental entity, such as the property appraiser, confirms the validity of the claim? Does this case really stand for the proposition that an insured has a duty to disclose any known claims? Does the duty apply only to claims about which the insured has actual knowledge or does it also extend to those about which the insured should have knowledge? Does the insured have some duty to make inquiry? Is the lack of reliance the fact that the insured knew of the unresolved claim or the fact that he did not purchase the property in reliance on the policy? What if the insured relies upon the policy to develop the property, rather than acquire it?
Rather than formulate potentially bad law to address the peculiar facts of this one case, I would leave the law alone and let the chips fall where they may here. Appellant still must prove damages measured by the value of the property. I am certain that this title insurer and others can take measures to avoid similar dilemmas in the future.
I would reverse.
NOTES
[1] Marion County issued a "Certificate of Correction" in October 2005.
[2] We find no merit to Nourachi's argument that First American lost any right it had to rescind the title policy by failing to promptly seek rescission. Nourachi did not suffer any prejudice from First American's delay in seeking to amend its complaint to add a count for rescission.
[3] The dissent's suggestion that our decision will somehow cause "unforeseen havoc" is belied by the scarcity of case law involving situations where a party who has procured title insurance subsequent to acquiring a property interest is alleged to have had actual knowledge of an express defect in title at the time the policy was issued. On the other hand, the adoption of the dissent's position would encourage individuals with actual knowledge of their defective title to seek to "remedy" their circumstances by engaging in a search for a title company that would "hopefully" perform a deficient title search.
[4] The trial judge also mentioned the duty of good faith, but this theory may not be invoked to vary an express term in a contract, or to supply a missing term. Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc., 785 So.2d 1232, 1235 (Fla. 4th DCA 2001).
[5] Judge Lawson argues an alternative basis for affirming the trial judge  the "fortuity" doctrine, which is grounded in the notion that certain insurances are intended to protect against a risk of an accidental loss. It operates to preclude coverage for accidents that occur before the effective date of the insurance because those losses are not "risks," and therefore, not insurable. Rohm & Haas Co. v. Cont'l Cas. Co., 566 Pa. 464, 781 A.2d 1172, 1177 (2001). The linchpin of this principle is the lack of insurability of the loss, not the lack of disclosure. Judge Lawson does not and cannot cite a single example where this doctrine has been applied in a title insurance case because the doctrine simply has no application outside the context of indemnity, casualty, life or other similar insurances where the premiums are based on actuarial predictions about future occurrences. Title insurance, by contrast, is a "guaranty that the search was accurate and that it expresses the quality of the title shown by the record." Krause v. Title & Trust Co. of Fla., 390 So.2d 805, 806 (Fla. 5th DCA 1980). Title insurers assume the risk that they overlooked something that occurred prior to the issuance of the policy. They base the premium on the dollar amount of coverage. The "loss" is a "defect" in marketable title, not a potential, future happening. In the case of title insurance, the loss always predates the issuance of the policy. These are not "uninsurable" losses. They are the precise losses contemplated by title insurance. If the concurring opinion is right, then Judge Lawson should not have joined in the reasoning of the majority opinion because the pre-purchase, post-purchase distinction identified by the majority is repugnant to his theory, as are the cases embodying the general rule that the majority opinion accepts as correct. Judge Lawson's view also directly contradicts the policy language because under no circumstances would the exception to the exclusion ever apply.
[6] The test for at least two of these elements is objective. The test for materiality is whether "a reasonable man would attach importance to [the fact's] existence or nonexistence in determining his choice of action in the transaction in question." Restatement (Second) of Torts § 538. Justifiable reliance, likewise, is an objective standard as the matter must be material for the reliance to be justified. Id.