[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-12518

_____

PRIME PROPERTY AND CASUALTY INSURANCE COMPANY,
a foreign corporation,

Plaintiff-Counter Defendant-Appellant-Cross Appellee,

*versus*

KEPALI GROUP, INC.,
YORDANI OLIVA RODRIGUEZ,

Defendants-Counter Claimants-Cross Claimants,

Appellees,

JACQUELINE RONEY,
JACKERLINE ROSE RONEY,

Defendants-Appellees,

BROWN & BROWN OF FLORIDA, INC.,
NORMAN L. MORRIS,

Counter Defendants-Cross Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:21-cv-81787-WPD

_____

Before JORDAN, LAGOA, and TJOFLAT, Circuit Judges.

JORDAN, Circuit Judge:

This case requires us to decide whether, under Florida law, a corporate vehicle was covered at the time of an accident under a commercial automobile insurance policy's after-acquired auto provision.

**I**

**A**

Kepali Group procured and adjusted insurance for its fleet of vehicles through an insurance agent at Brown & Brown of Florida. Prime Property & Casualty Insurance Company issued a

23-12518                 Opinion of the Court                        3

commercial automobile policy to Kepali for the period from January 23, 2019, to January 23, 2020. Kepali paid an initial lump-sum premium for insuring its fleet of vehicles. Anticipating that vehicles could be added and dropped, the policy contained a "premium audit" provision allowing Prime to "compute the final premium" and bill Kepali for any outstanding "balance" (or issue any appropriate credit or refund) once Prime calculated Kepali's "actual exposures." *See* D.E. 1-1 at 15.

The policy also contained a provision titled "Owned Autos You Acquire After The Policy Begins." That provision states, in relevant part, as follows:

> [A]n "auto" you acquire will be a covered "auto" for that coverage only if:
>
> a. We already cover all "autos" that you own for that coverage or it replaces an "auto" you previously owned that had that coverage; and
>
> b. You tell us within 30 days after you acquire it that you want us to cover it for that coverage.

*Id.* at 8. This provision does not mention the payment of an additional premium for an after-acquired vehicle.[1]

On December 6, 2019, a 2009 Toyota Sienna owned by Kepali with a VIN ending in 3985 was involved in an accident while driven by Yordani Rodriguez. The passengers of the other car sued

---

[1] It is undisputed that Kepali insured all its vehicles under the Prime policy.

Kepali and Mr. Rodriguez for damages.  The dispute in this case concerns insurance coverage for the 3985 Toyota.

## B

On September 30, 2019, Kepali acquired the 3985 Toyota. Kepali also acquired two Mercedes vehicles.  On October 3, 2019, Kepali notified Brown that it wanted to add the two Mercedes to its policy with Prime, and to add the 3985 Toyota to a separate policy it had with Progressive.  The following day, Brown sent the coverage request for the two Mercedes to Prime.  In its email to Prime, Brown included a request that a 2009 Toyota Sienna with a VIN ending in 0079 be amended from vehicle #00002 to vehicle #00001 on the Prime policy.  The 0079 Toyota was already listed as an insured vehicle on the Prime policy.

Later that same day, Prime sent a quote to Brown requesting payment of a $2,457 premium to add coverage for the two Mercedes and the 0079 Toyota.  Kepali paid the premium and returned the signed quote, and Prime issued an endorsement for the two Mercedes and the 0079 Toyota.  Brown emailed Kepali attaching the "endorsement for adding the two [M]ercedes . . . on to the policy" and noting that "[a]n endorsement to add the Toyota should follow shortly."

While Brown was in the process of procuring an endorsement for the two Mercedes, Kepali had emailed Brown requesting to add the 3985 Toyota to the Prime policy instead of to the Progressive policy.  On October 4, 2019, Brown sent a request to Prime to add the 3985 Toyota to the Prime policy.

23-12518                 Opinion of the Court                        5

On October 7, 2019, Prime sent a quote to Brown requesting payment of a $2,391 premium for coverage of the 3985 Toyota. The body of the email stated that the "[e]ndorsement cannot be processed without . . . [s]igned quote, and sufficient payment made payable to 'EIB,'" and each page of the attachment stated that the "[p]remium must be received prior to the [e]ndorsement becoming effective."

In response, Brown emailed Prime stating: "We received the endorsement with the Toyota already listed on there. Please see attached." According to Kepali and Mr. Rodriguez, Brown attached to this email the previous endorsement for the two Mercedes and the 0079 Toyota.[2]

Kepali and Mr. Rodriguez allege that Prime never responded to Brown's email. Brown did not send the quote to Kepali for signature and payment. Prime never received a signed quote or a payment of the premium, and never issued an endorsement adding the 3985 Toyota to the policy. But Brown nonetheless, and without

---

[2] Prime had sent the previous endorsement to Brown before Brown requested to add the 3985 Toyota to Kepali's policy with Prime. It is undisputed that a Prime employee included the 0079 Toyota in the previous policy "based on her mistaken belief that Kepali's request that the 0079 Toyota be amended from vehicle #00002 to vehicle #00001 on the Policy was a request to add that vehicle to the Policy." D.E. 184 at 25–26. The district court found that the first endorsement "did not represent to Kepali that [Prime] added the 3985 Toyota to the Policy as it explicitly stated that it was adding the 0079 Toyota to the Policy." *Id.* at 27. The parties do not challenge this finding on appeal.

authority from Prime to do so, issued a certificate of insurance and auto id cards for the 3985 Toyota.

## C

As noted earlier, Mr. Rodriguez was involved in an accident on December 6, 2019, while driving Kepali's 3985 Toyota. Prime initiated the present action seeking a declaration that it had no duty to defend or indemnify Kepali and Mr. Rodriguez based on its assertion that the 3985 Toyota had never been added to the insurance policy. Kepali and Mr. Rodriguez counterclaimed against Prime and impleaded Brown, seeking a declaration that Brown was Prime's agent and that Prime was required to provide coverage under the policy because Brown had told Kepali that the 3985 Toyota had been added. Kepali and Mr. Rodriguez also brought claims against Prime for reformation, promissory estoppel, breach of fiduciary duty, and negligent misrepresentation.

At summary judgment, the district court ruled that Brown was acting as Kepali's agent, not Prime's, when attempting to procure insurance for the 3985 Toyota. But the court nonetheless concluded that the 3985 Toyota was covered under the policy because the after-acquired auto provision only listed two conditions for coverage, both of which had been met: (1) Prime covered all of Kepali's vehicles; and (2) Kepali (through Brown) told Prime within 30 days of acquiring the 3985 Toyota that it wanted coverage for that vehicle. The court reasoned that although Prime could charge Kepali a premium for after-acquired vehicles, payment was not a condition precedent to triggering continued coverage. The court

ruled that Prime had a duty to defend Kepali and Mr. Rodriguez, but declined to rule on the duty to indemnify until the underlying suit against Kepali and Mr. Rodriguez had been resolved. The court granted summary judgment against Kepali and Mr. Rodriguez on their reformation and promissory estoppel claims and dismissed the remaining claims of breach of fiduciary duty and negligent misrepresentation as moot.

Prime now appeals the district court's ruling that it has a duty to defend. It argues that the 3985 Toyota was not covered under the policy at the time of the accident.

## II

We review a district court's grant of summary judgment de novo, viewing all evidence and drawing all reasonable inferences in favor of the non-moving party. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The interpretation of an insurance contract presents a question of law that may be decided at the summary judgment stage. *See Tech. Coating Applicators, Inc. v. U.S. Fid. & Guar. Co.*, 157 F.3d 843, 844 (11th Cir. 1998); *Coleman v. Fla. Ins. Guar. Ass'n, Inc.*, 517 So.2d 686, 690 (Fla. 1988). The parties agree that Florida law applies in this diversity action.

## III

Prime argues that the district court erred in finding that it has a duty to defend Kepali for the December 6, 2019, accident. Prime contends (1) that the grace period for coverage without payment of an additional premium was only 30 days, after which the coverage expired because (a) no payment was made and (b) Prime did not know that Kepali sought continued coverage; and (2) alternatively, that Kepali needed to pay the additional premium for the 3985 Toyota before the policy expired in order to obtain coverage. We address each argument in turn.

## A

Prime asserts that payment of the quoted premium was a condition precedent for coverage to continue after the 30-day notice period. Although the after-acquired auto provision required Kepali to notify Prime within 30 days of acquiring a vehicle, there is nothing in that provision or the rest of the policy to suggest that once the insurance kicked in, it would be terminated after 30 days for failure to pay a premium. *See, e.g.,* D.E. 1-1 at 8 ("You tell us within 30 days after you acquire it that you want us to cover it for that coverage."). We are bound to apply the terms of the policy as written and will not add additional terms or limitations. *See Key v. Allstate Ins. Co.,* 90 F.3d 1546, 1549 (11th Cir. 1996) ("With respect to insurance policies in particular, which are often long, detailed, and difficult for most insureds to decipher, insurers, as drafters of insurance policies, have an obligation to state explicitly their intentions to limit coverage upon the happening of certain events or

23-12518                 Opinion of the Court                 9

under certain circumstances.") (citations omitted).  This is particularly so here because the policy contains an integration clause which states that "[t]his policy contains all the agreements between you and us concerning the insurance afforded."  D.E. 1-1 at 19.  Under Florida law an integration clause like this one makes extrinsic agreements unenforceable unless they are contained within the policy itself.  *See, e.g., Billington v. Ginn-La Pine Island, Ltd., LLLP*, 192 So.3d 77, 80 (Fla. 5th DCA 2016); *World-Class Talent Experience, Inc. v. Giordano*, 293 So.3d 547, 549 (Fla. 4th DCA 2020).

None of the out-of-state decisions Prime cites is persuasive. Two of the cited cases do not categorically hold, as Prime suggests they do, that after-acquired vehicle coverage is terminated at the end of the notice period if the insured has not yet paid the additional premium requested.  *See Sackett v. Nationwide Mut. Ins. Co.*, 940 A.2d 329, 333–34 (Pa. 2007) (explaining that where the "after-acquired-vehicle clause is *expressly* made finite by the terms of the policy," automatic coverage could expire, but noting that other after-acquired auto provisions "contemplate continuing coverage") (emphasis added); *Consumers United Ins. Co. v. Johnson*, 614 P.2d 657, 660 (Wash. Ct. App. 1980) (concluding that, "[w]ith no specific date for payment, the additional premium was payable at any time before the end of the policy period").  As explained below, the third out-of-state case cited by Prime is directly contradicted by Florida precedent, which controls.  *Compare Miller v. New Amsterdam Cas. Co.*, 96 S.E.2d 860, 865 (N.C. 1957) (holding that insurance coverage for after-acquired vehicles does not begin until the additional premium is paid), *with Rabatie v. U.S. Sec. Ins. Co.*, 581 So.2d 1327,

1330–31 (Fla. 3d DCA 1990) (en banc) (holding that "coverage attaches immediately upon acquisition of the after-acquired vehicle" so long as timely notification is provided).

The Florida Third District case that Prime cites, *Rabatie*, does not stand for the proposition that coverage *only* extends for the 30-day notice period. *Rabatie* instead held that a similar after-acquired auto provision provided coverage during the 30-day grace period, even before the owner gave notice that it sought coverage, as long as the owner ultimately provided timely notification. *See Rabatie*, 581 So.2d at 1330. *Cf. Lowe v. State Farm Mut. Ins. Co.*, 420 So.2d 318, 319 (Fla. 5th DCA 1982) (holding that a newly-acquired car was not covered for an accident occurring during the policy period because the insured failed to notify the insurer within 30 days of its purchase, as required by the policy, and only told the insurer after the policy period had ended).

*Rabatie* suggests that acquiring a vehicle triggers automatic coverage for the initial 30-day grace period, and notice of acquisition during that period triggers extended coverage, unless otherwise stated in the policy. *See Rabatie*, 581 So.2d at 1330. *See also* Jordan R. Plitt, et al., 8A Couch on Insurance § 117:25 (3d ed. & Dec. 2024 update) ("The automatic insurance clause generally provides that notice be given to the insurer within a specified period after the acquisition of a new automobile in order to continue coverage beyond the initial period of the automatic coverage."). As the district court noted, some after-acquired auto provisions require payment of an additional premium before coverage can be

extended to a newly acquired vehicle beyond the initial notice period. *See generally Construction and Application of "Automatic Insurance" or "Newly Acquired Vehicle" Clause ("Replacement," and "Blanket," or "Fleet" Provisions) Contained in Automobile Liability Policy*, 39 A.L.R. 4th 229, § 27 (1985 & 2025 update) (collecting cases). But the provision in Kepali's policy with Prime does not require such a payment.

In its reply brief, Prime claims for the first time that it never received satisfactory initial notice that Kepali wanted coverage for the 3985 Toyota because it never received a signed quote or premium payment from Kepali. But in the proceedings in the district court, Prime conceded that Kepali, through Brown, provided notice to Prime about coverage for the 3985 Toyota within the 30-day period. Prime's new factual assertion comes too late. *See English v. Universal CIT Credit Corp.*, 278 F.2d 750, 752 (5th Cir. 1960) (rejecting "an attempt to inject into the case an issue of fact not made, but conceded, below"). And Prime's assertion that it did not have notice that Kepali wished to *continue* coverage after the 30-day notice period—because it did not immediately receive a signed quote for the 3985 Toyota or the additional premium payment—is belied by the explicit terms of the after-acquired auto provision, which only require *an initial* notification within the 30-day period. *See* D.E. 1-1 at 8 ("You tell us within 30 days after you acquire it that you want us to cover it for that coverage."). As noted, Kepali provided the requisite initial notice through Brown. We therefore reject Prime's argument that coverage ended when the 30-day notice period expired.

We also reject Prime's assertion that any "payment after the thirty-day notice period has expired and after an accident involving the newly acquired vehicle is unreasonable as a matter of law." Prime Br. at 17.  The known loss principle, on which Prime relies, precludes procuring coverage after the fact for losses that have already taken place.  *See Interstate Fire & Cas. Co. v. Abernathy*, 93 So.3d 352, 358 (Fla. 1st DCA 2012).  That principle is not applicable here because Kepali sought and obtained coverage—in compliance with the terms of the after-acquired auto provision—before the accident occurred.

**B**

Prime contends, in the alternative, that Kepali needed to pay the additional premium for the 3985 Toyota before the policy expired in order to be entitled to coverage for the accident on December 6, 2019.  We are not persuaded by this argument either.

Although the after-acquired auto provision does not include a requirement to pay a premium by a certain date, we agree with Prime that Kepali is not entitled to free coverage for an additional vehicle.  *See Rabatie*, 581 So.2d at 1330 ("[A]lthough the insurance is effective immediately upon delivery of the newly acquired vehicle, the coverage is not 'free'; the insurer may adjust the premium retroactively to the date of acquisition.").  Nor does the lack of a precise due date in the policy excuse Kepali from payment. "Simply because a contract is unclear as to when payment must be made does not relieve a party of an obligation to make payment." *Indep. Mortg. & Fin., Inc. v. Deater*, 814 So.2d 1224, 1225 (Fla. 3d

23-12518                Opinion of the Court                13

DCA 2002).  And where a contract does not specify a payment due date, "the law will imply a reasonable time." *De Cespedes v. Bolanos*, 711 So. 2d 216, 218 (Fla. 3d DCA 1998) (citation omitted).

But before resorting to such common-law principles, we must consult the terms of the policy.  "In construing insurance contracts, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Wash. Nat'l Ins. Corp. v. Ruderman*, 117 So.3d 943, 948 (Fla. 2013).  *See also* Fla. Stat. § 627.419(1) ("Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy[.]").  We address each of the three provisions discussed by the parties.

**1**

First, the policy includes a "premium audit" provision, which reads as follows:

Premium Audit

a.  The estimated premium for this Coverage Form is based on the exposures you told us you would have when this policy began.  We will compute the final premium due when we determine your actual exposures.  The estimated total premium will be credited against the final premium due and the first Named Insured will be billed for the balance, if any.  The due date for the final premium or retrospective premium is the date shown as the due date on the bill.  If the estimated total premium exceeds the final premium due, the first Named Insured will get a refund.

b.  If this policy is issued for more than one year, the pre-
    mium for this Coverage Form will be computed an-
    nually based on our rates or premiums in effect at the
    beginning of each year of the policy.

D.E. 1-1 at 15.  The policy therefore contemplated a situation in
which Kepali would have an outstanding premium it owed Prime
at the end of the policy period, and set forth a process for billing
and payment of this premium.  Moreover, the policy specified that
the due date for the final premium would be determined by the
due date on the bill Prime was to provide.

The addition of a vehicle like the 3985 Toyota to the policy
would obviously increase Kepali's exposure and lead to an addi-
tional premium.  Recall that Kepali sought to add the 3985 Toyota
in October of 2019, when about three and a half months were left
in the policy period.  Prime had the ability to use the premium au-
dit provision to compute a "final premium" for Kepali once its "ac-
tual exposures" had been determined.  *See Bennett v. Hartford Ins.
Co. of Midwest*, 890 F.3d 597, 605–06 (5th Cir. 2018) (explaining that
a similar "[p]remium [a]udit" provision in a business automobile
insurance policy is used to compute the final premium due once
the insured's actual exposures during the policy period are deter-
mined).[3]

---

[3] "Premium audit" provisions are not unusual in some commercial insurance
policies.  "In liability insurance and in other types of insurance, the commercial
policy holder also promises to submit a 'premium audit' in which the insurer
. . . determine[s] if [the insured] has paid the required premium[,] . . . [which]
is recalibrated according to the actual exposure of the policyholder during the

Sending Kepali a final bill would also have resolved any overpayments that may have occurred during the policy period. On October 4, 2019, Brown sent a coverage request to Prime on Kepali's behalf seeking to (a) add two Mercedes vehicles and (b) amend the 0079 Toyota from vehicle #00002 to vehicle #00001. Prime sent a quote to Brown requesting payment of a $2,457 premium to add coverage for all three vehicles—even though the 0079 Toyota was already listed as an insured vehicle on the Prime policy—and Kepali paid that premium in full. So Kepali paid Prime some money for a vehicle that was already insured. Nothing in the record indicates that Prime ever credited Kepali for this overpayment. If Kepali still owed some additional premium for the 3985 Toyota beyond the amount it had overpaid on the 0079 Toyota, the "premium audit" reconciliation would have settled exactly how much was due and when any payment was due.

But Prime did not perform a "premium audit" and never sent Kepali a bill for the "final premium" that took into account all the changes made during the policy period. Having failed to avail itself of a mechanism in the policy to obtain payment for the 3985 Toyota, Prime cannot now resort to a common-law default principle about payment needing to be made within a reasonable time.

Prime says that the premium audit provision applies only to "any 'auto'" and "owned 'autos' only" policies, not to the

_____

time insured." Hazel Beh & Jeffrey W. Stempel, *Misclassifying the Insurance Policy: The Unforced Errors of Unilateral Contract Characterization*, 32 Cardozo L. Rev. 85, 126 (2010).

16                      Opinion of the Court                23-12518

"specifically described 'autos'" policy that Kepali selected. But nothing in the provision says so. Whereas the after-acquired auto provision specifies different conditions of coverage depending on the type of policy selected, the premium audit provision does not condition its application upon the specific type of policy selected. The premium audit provision is located under a header titled "Business Auto Conditions," which states that "[t]he following conditions apply in addition to the Common Policy Conditions," followed by a sub-header titled "General Conditions[.]" D.E. 1-1 at 14–15. Because this policy is a "business auto" policy, the premium audit provision applies to Kepali's policy.

**2**

Second, the policy contains a provision allowing Prime to cancel coverage for Kepali's failure to pay a premium. That provision requires Prime to notify Kepali in writing prior to canceling coverage. *See* D.E. 1-1 at 19, 28. *See also* Fla. Stat. §§ 627.728, 627.7281 (mandating that insurers follow a similar process to cancel auto coverage) & § 627.7282 (specifically addressing notice requirements for cancellation due to nonpayment of "additional premium[s]" calculated during the policy period).[4]

---

[4] As the First District Court of Appeal of Florida explained, Florida's insurance code

> manifest[s] a strong public-policy interest in having motor vehicle insurance made readily available to owners and operators of automobiles . . . without interruption, lapse, or termination of coverage due to unwarranted cancellation or nonrenewal by the insurer, or because of the insured's inadvertent failure,

23-12518                Opinion of the Court                17

If Prime had elected to terminate the coverage after a 30-day period for Kepali's failure to pay the quoted premium, it needed to follow the contractually agreed-upon method for doing so. *See Sotomayor v. Seminole Cas. Ins. Co.*, 650 So.2d 663, 664–65 (Fla. 5th DCA 1995) (concluding that the cancellation of an auto insurance policy for failure to pay an additional premium was ineffective because the insurer failed to comply with the notice requirements in Fla. Stat. § 627.7282). And if Prime had wanted coverage to immediately terminate when an initial premium for an after-acquired vehicle was past due, it could have drafted the policy accordingly. For example, the cancellation provision provides that "[f]ailure to pay the required *renewal or continuation premium* when due shall mean that you have not accepted our offer"—but the policy does not use this language for other types of premiums. *See* D.E. 1-1 at 29 (emphasis added).

**3**

Third, Prime points to language in the policy stating that only "those 'autos' . . . *for which a premium charge is show*n" receive coverage, *see* D.E. 1-1 at 7 (emphasis added), and argues that the 3985 Toyota did not receive coverage because no premium charge was shown for that vehicle. This argument, we think, ignores the structure of the policy. The quoted language provides the initial

for lack of knowledge that the coverage is about to be terminated, to take the actions necessary to continue the policy in force.

*Hepler v. Atlas Mut. Ins. Co.*, 501 So.2d 681, 684 (Fla. 1st DCA 1987).

coverage for a set of "specifically described 'autos'" agreed upon at the beginning of the policy period.  The next section of the policy is the after-acquired auto provision, which provides additional coverage for vehicles that are not listed as "specifically described 'autos'" but are added after the policy begins.  The after-acquired auto provision does not state that coverage is limited to autos for which a premium charge is shown.  Nor can Prime's interpretation be squared with Florida precedent indicating that coverage begins upon acquisition of a new automobile even before notice is given or a premium is paid (as long as notice is timely provided).  *See Rabatie*, 581 So.2d at 1330.

Because the premium audit and cancellation provisions resolve the payment due date, we reject Prime's argument that payment for the 3985 Toyota was due before the end of the policy period.  *See generally Consumers United Ins. Co.*, 614 P.2d at 660 (holding that where a policy provides no specific date for payment, "the additional premium [i]s payable at any time before the end of the policy period").  We also reject Prime's argument that, because Kepali usually paid immediately upon receipt of a quote, this previous course of conduct determined what constituted a reasonable time for payment.  *See* Prime Br. at 16–17 (citing *Hicks v. Keebler*, 312 So.3d 1001, 1005 (Fla. 2d DCA 2021)).  "[U]nless an ambiguity exists, a court should not resort to outside evidence[.]"  *Key*, 90 F.3d at 1549 (citing *Rigel v. Nat'l Cas. Co.*, 76 So.2d 285, 286 (Fla. 1954)).  *See also Hepler v. Atlas Mut. Ins. Co.*, 501 So.2d 681, 687 (Fla. 1st DCA 1987) ("[A]mbiguities in contracts may be resolved by taking into account the course of dealing between the parties.").  We find no

ambiguity in the premium audit and cancellation provisions, which provide agreed-upon avenues for Prime to address outstanding premiums.

Finally, we are not moved by Prime's suggestion that because its October 7, 2019, email and attached quote stated that no coverage would be provided until the premium had been paid, this effectively set a due date for payment. As noted, the policy itself contains an integration clause stating that "[t]his policy contains all the agreements between you and us concerning the insurance afforded." D.E. 1-1 at 19. We look to the terms of the policy when determining coverage, and under Florida precedent, unless otherwise stated in the policy itself, coverage begins when the vehicle is acquired so long as notice is provided during the notice period. *See Rabatie*, 581 So.2d at 1330.

## IV

We affirm the district court's ruling on summary judgment that Prime has a duty to defend Kepali and Mr. Rodriguez in the underlying state court action.

**AFFIRMED.**